[Nos. 59711-1, 59712-0. En Banc. September 9, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. VENTURA
MURILLO VALDOBINOS, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. RAFAEL
MENDOZA GARIBAY, *Appellant*.

272

*Mansfield, Reinbold & Gardner* and *Rodney M. Reinbold,* for appellant Valdobinos.

*Paul J. Wasson,* for appellant Garibay (appointed counsel for appeal).

*Michael E. McNeff, Prosecuting Attorney,* and *Joe Solseng, Deputy,* for respondent.

*Christine O. Gregoire, Attorney General,* and *Tommy Prud'homme, Assistant,* on behalf of the Washington National Guard, amicus curiae for respondent.

UTTER, J. — Ventura Valdobinos and Rafael Mendoza Garibay appeal their sentences and convictions for delivery, conspiracy to deliver and possession of cocaine. We affirm their convictions but strike the portion of their sentences based on the use of a weapon under RCW 9.94A.125.

On December 10, 1990, an Okanogan County drug task force undercover agent, Vilchez, went to the Lincoln Tavern to make a drug buy. Vilchez testified that he had a conversation with Valdobinos at that time, and that Valdobinos offered to sell him cocaine. At trial, Vilchez also testified that Valdobinos introduced him to Garibay, and told him that Garibay had brought the cocaine from California.

On December 12, 1990, Superior Court Judge Edwards signed a search warrant directing peace officers to search the mobile home of Valdobinos and Garibay. Clerk's Papers, at 12. The next day, a 9-person search party arrived at the home. The search party included approximately five law enforcement officers and four National Guardsmen who volunteered to serve under the Federal Drug Interdiction Program.

The local police authorities arrested, questioned and searched the defendants and took them to the Okanogan County Jail. Garibay was found to have $2,140 in one pocket, Report of Proceedings vol. II, at 150, of which $350 had serial numbers matching the buy money used in the December 10, 1990, drug transaction. The home was then cleared. The four Guardsmen were directed by the law enforcement officers to reenter and were assigned to search the bedroom. It is un-

contested that at all relevant times the Guardsmen were supervised by local law enforcement authorities.

One of the National Guardsmen found a black bag containing $1,875, 846 grams of cocaine, and a bus ticket bearing Garibay's name under a bed.

On December 18, 1990, Valdobinos and Garibay were charged, and a jury trial was set for February 25, 1991. Although the cases were initially consolidated, Garibay and Valdobinos were ultimately tried separately.

After a jury trial, Valdobinos was convicted of delivery of a controlled substance, cocaine, RCW 69.50.401(a)(1)(i); conspiracy to deliver a controlled substance, cocaine, RCW 69-.50.401(a)(1)(i); and possession of a controlled substance with intent to deliver while armed with a deadly weapon. RCW 69.50.401(a)(1); RCW 9.94A.125. After a bench trial on stipulated facts, Garibay was charged and convicted of the same counts: possession, delivery and conspiracy to deliver cocaine. Both cases were consolidated for the purpose of this appeal. We affirm the convictions, but strike the portions of their sentences imposed for being armed with a deadly weapon. The assignments of error common to both Valdobinos and Garibay are treated together; those made singly by one or the other defendant are discussed separately.

COMMON ASSIGNMENTS OF ERROR

I

SPEEDY TRIAL

■ Valdobinos and Garibay argue the trial court violated their right to a speedy trial. That contention is without merit. The right to a speedy trial may be waived. *State v. Williams*, 87 Wn.2d 916, 557 P.2d 1311 (1976). Waivers may be implied from a defendant's request for a continuance. *See State v. Freeman*, 54 Wn. App. 734, 737, 775 P.2d 993 (1989) (citing *State v. Colbert*, 17 Wn. App. 658, 564 P.2d 1182, *review denied*, 89 Wn.2d 1010 (1977)).

On February 21, 1991, when the two cases were consolidated, Garibay, Valdobinos, and a third defendant made a motion to continue their trial dates until April 15, 1991, and

promised written waivers of their right to a speedy trial. At that time, Valdobinos's attorney explained that he wished a continuance to permit his client to retain new counsel. He specifically promised to waive Valdobinos's speedy trial right until the end of April: "I have a motion for a continuance . . .. And I am asking for a continuance to April 15th. *My client is willing to waive until April 30th*." (Italics ours.) Report of Proceedings (Feb. 21, 1991), Hearing on Motion To Consolidate, at 6. He emphasized, "And I think my client clearly is willing to waive his speedy trial right. He has the right to hire counsel of his own choosing." Report of Proceedings (Feb. 21, 1991), Hearing on Motion To Consolidate, at 8. Garibay's attorney joined in the motion to continue, stating, "I would also join in Mr. Stuart's motion for a continuance until April 15, and my client would also waive." Report of Proceedings (Feb. 21, 1991), Hearing on Motion To Consolidate, at 7. The continuance was granted.

Thereafter, Garibay also decided to retain new counsel. On March 7, the parties asked the trial court for a second continuance until April 15 so that Garibay's new attorney could familiarize himself with the case. At that time, Garibay's attorney again waived Garibay's speedy trial rights: "Both Mr. Garibay and his codefendant are in custody, and he's willing to waive any speedy trial considerations. So, we'd ask that there be a continuance to allow him to employ private counsel." Report of Proceedings (Valdobinos) (Mar. 7, 1991), at 3. The continuance was granted. Valdobinos's new attorney, Mr. Reinbold, claimed that Valdobinos's previous attorney had moved for a continuance without Mr. Reinbold's knowledge, and stated he objected to waiver of his client's right to a speedy trial.[1] The court continued the trial that had been set for the following week. Report of Proceedings (Valdobinos) (Mar. 7, 1991), at 9. Garibay's attorney reminded the court: *"One of the things that was discussed at the time when Mr. Stuart asked for an extension for Mr.*

---

[1]Valdobinos cites no authority for the proposition that one attorney's waiver can be invalidated on the bare assertion that it was unauthorized by the new attorney.

*Valdobinos to hire Mr. Reinbold was that we agreed to waive to the end of April.*" (Italics ours.) Report of Proceedings (Valdobinos) (Mar. 7, 1991), at 12-13.

■ Although the promised written waivers were never received, the record reveals that the first continuance was granted at Valdobinos's request, the second at Garibay's, and both on the assurance the court would receive written waivers extending until the end of April. Under these circumstances, it cannot reasonably be said that the defendants did not waive their right to a speedy trial.

## II
### FAILURE TO EXCLUDE EVIDENCE FOUND
### IN A SEARCH BY NATIONAL GUARDSMEN
### The Posse Comitatus Act

Valdobinos and Garibay assert next that the trial court erred in refusing to suppress the evidence found in the search by police officers assisted by the National Guard. They maintain the search violated 18 U.S.C. § 1385, which prohibits military forces from executing the laws.

18 U.S.C. § 1385 was originally adopted by Congress in the post-Civil War era as a response to perceived abuses in the use of military forces during Reconstruction. *See United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986). *See also State v. Short*, 113 Wn.2d 35, 38, 775 P.2d 458 (1989); *Airway Heights v. Dilley*, 45 Wn. App. 87, 89, 724 P.2d 407 (1986). The statute is commonly referred to as the posse comitatus act. It provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses *any part of the Army* or the Air Force as a posse comitatus or otherwise *to execute* the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

(Italics ours.) 18 U.S.C. § 1385.

Appellants contend the evidence seized should have been excluded by the trial court because it was the product of an illegal search. Even assuming a violation of the posse comitatus act occurred, a question we do not reach, the favored

remedy for such a violation is not exclusion of the evidence. *See State v. Short*, 113 Wn.2d at 40.

■ First, the statute itself identifies the potential consequences of a violation: a fine or imprisonment or both. The Legislature thus manifestly contemplated the question of remedies and provided those it intended. That is one reason why attempts by criminal defendants to use violations of the act as a ground to exclude evidence have been generally unavailing. *See* Julian, *Noriega: The Capture of a State Leader and Its Implications on Domestic Law*, 34 Air Force L. Rev. 153, 172 (1991) (discussing *United States v. Hartley*, 796 F.2d 112 (5th Cir. 1986)). *See also Airway Heights v. Dilley*, 45 Wn. App. at 89; *United States v. Roberts*, 779 F.2d 565 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). *Cf. Taylor v. State*, 645 P.2d 522 (Okla. Crim. App. 1982).

Second, we are reluctant to resort to the exclusionary remedy for violations of the posse comitatus act. We have previously stated that "evidence obtained in violation of the act is not excluded unless there is an unauthorized assertion of military authority or a need for exclusion as a deterrent to future violations." *Short*, 113 Wn.2d at 40 (citing *Taylor v. State*, *supra*; *Lee v. State*, 513 P.2d 125, 126 (Okla. Crim. App. 1973), *cert. denied*, 415 U.S. 932, 39 L. Ed. 2d 490, 94 S. Ct. 1445 (1974); *United States v. Roberts, supra*; *United States v. Walden*, 490 F.2d 372 (4th Cir. 1974), *cert. denied*, 416 U.S. 983, 40 L. Ed. 2d 760, 94 S. Ct. 2385 (1974)).

On this record, there is neither a showing of unauthorized assertion of military authority, nor persuasive evidence such a remedy is necessary to deter future violations. The trial court therefore did not err in failing to suppress the evidence found by the National Guard.

## III
### AUTHORIZATION UNDER STATE LAW
■ Valdobinos and Garibay maintain the National Guard was not authorized to assist local police forces in this instance because only the Governor is authorized to activate the National Guard, and he did not do so here. The record in

this case does include a copy of the adjutant general's authorization. See Brief of Amicus Curiae app., at 20-23. Valdobinos and Garibay fail to cite Washington authority for the proposition that the Governor is limited from exercising his powers through the intermediary of the adjutant general. Because the adjutant general is responsible to, and derives his authority from, the Governor, *see* RCW 38.08, we conclude an authorization by the adjutant general is sufficient to activate the Guard.

ASSIGNMENTS OF ERROR MADE BY VALDOBINOS

IV

SUBORDINATION OF THE MILITARY
TO THE CIVIL AUTHORITY

Valdobinos argues the use of the National Guard violated the Washington State Constitution because the military must at all times be subordinate to the civil authority. Const. art. 1, § 18.

■ The argument is without merit on these facts because there was no showing below that the Guard was not at all relevant times under the control of, and supervised by, local police authorities. The National Guardsman who found the cocaine testified that his services were requested by the Okanogan County Sheriff, and he and the other Guard members acted in subordination to, and support of, the sheriff. The Guard members entered the home only after law enforcement officers had secured it and directed them to enter. It is uncontested that a law enforcement officer was present and supervising the Guard members as they searched the home. Valdobinos's argument therefore fails.

V

EXCLUSION OF EVIDENCE OF WITNESS BIAS

Valdobinos argues the trial court erred in excluding evidence suggesting Vilchez was biased in favor of the State because he had not been prosecuted on a Douglas County assault charge.

The evidence the trial court excluded was Valdobinos's request to call to the stand witnesses to Vilchez's alleged assault. Valdobinos maintains the Douglas County prosecutor had falsely claimed the witnesses were unavailable to testify against Vilchez. At trial, Valdobinos hoped to have these witnesses testify that they had in fact been available. He thus hoped to show that Vilchez owed the police a debt for failing to prosecute him on a serious charge.

The court gave two reasons for its denial: the matter was collateral to the principal issues before the jury, and there was insufficient evidence to warrant this line of inquiry. We find no abuse of discretion in that ruling. Both Vilchez and United States border patrol agent Bauman stated in an in limine hearing that Vilchez's status as an informant was unconnected to charges not being filed against him in the previous assault. The court was also presented an affidavit of Frank Jenny, the prosecutor on the alleged assault charge. The affidavit stated that the investigating officer told Mr. Jenny none of the witnesses to the assault would cooperate with him and that the officer could not get statements from them.

We reject the argument that Valdobinos was denied the opportunity to show witness bias. First, it is simply not true that Valdobinos was denied the opportunity to suggest Vilchez's bias. Valdobinos's counsel repeatedly inquired into his possible bias at trial and during closing argument. See Report of Proceedings (Valdobinos) vol. II, at 2-25, 74-78, 86-89; Report of Proceedings (Valdobinos) vol. III, at 139-42. Second, the reasons supplied by the trial court for refusing to permit collateral inquiry into the matter of bias are not reversible under the applicable abuse of discretion standard. *See, e.g., State v. Demos*, 94 Wn.2d 733, 736-37, 619 P.2d 968 (1980) (applying an abuse of discretion standard to the trial court's refusal to admit evidence). *See also State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 482 P.2d 775 (1971) (a trial court abuses its discretion when its exercise is manifestly unreasonable, or based on untenable grounds or reasons). There was no abuse of discretion.

## VI
### CONSPIRACY INSTRUCTION

Valdobinos argues the trial court erred in instructing the jury on the conspiracy charge. Although we agree the instruction was flawed, the error was harmless given the context in which it occurred. Instruction 9 stated in pertinent part:

> To convict the defendant of the crime of Conspiracy To Deliver A Controlled Substance, To-Wit: Cocaine as charged in Count II of the Information, each of the following elements must be proved beyond a reasonable doubt:
> (1) That between the 9th and 13th days of December, 1990, the defendant agreed with one or more persons to engage in or cause the performance of conduct constituting the crime of Delivery of A Controlled Substance, To-Wit: Cocaine . . ..

Supplemental Clerk's Papers (Valdobinos), at 35.

The instruction is indeed erroneous. Because the crime of delivery necessarily requires the participation of two persons, if only those two persons are alleged to have participated in the illicit agreement, the charge of conspiracy cannot lie. *See State v. Langworthy*, 92 Wn.2d 148, 152, 594 P.2d 908 (1979). On the instruction cited above, it is theoretically possible for the jury to have concluded that the agreement to which reference is made in the conspiracy instruction was one between Valdobinos and Vilchez. That would violate the rule that where both delivery and conspiracy are alleged, the conspiracy must allege the involvement of a person additional to those involved in the delivery.

■ The error was harmless in this case, however, because the only arguments about conspiracy made to the jury in closing concerned Valdobinos and Garibay, a third party. Indeed, both the prosecutor and defense counsel explicitly referred to the alleged conspiracy as occurring between Valdobinos and Garibay. The prosecutor stated:

> What this charge [conspiracy] is concerned with, what really it's worried about is, are you satisfied from the evidence you have seen here in court that there was some *agreement between the defendant [Mr. Valdobinos] and Mr. Garibay to sell cocaine?* And after that agreement was reached, did one of

them take a substantial step towards carrying out that agreement?

(Italics ours.) Report of Proceedings (Valdobinos) vol. III, at 124.

Defense counsel in closing also framed his discussion of the conspiracy charge with reference to Valdobinos and Garibay:

The number one element — if you are going to find that the defendant conspired to possess cocaine, there has to be evidence of an agreement, not a theory that there was an agreement; not a guess, "Gosh, I guess there must have been an agreement," but proof beyond a reasonable doubt that there was an *agreement between Mr. Garibay and Mr. Valdobinos.*

(Italics ours.) Report of Proceedings (Valdobinos) vol. III, at 145.

Under these circumstances, it is highly unlikely that when the jury considered the conspiracy charge, it did so as occurring between anyone other than Garibay and Valdobinos. We therefore conclude the instructional infirmity does not constitute reversible error.

## VII
### PROPRIETY OF THE DEADLY WEAPON ENHANCEMENT

Valdobinos argues also that the trial court erroneously instructed the jury on the deadly weapon charge under RCW 9.94A.125, because the State proved only that it found an unloaded .22 rifle under a bed in the home. We agree.

RCW 9.94A.125, authorizing an enhanced sentence if the defendant is *armed* with a deadly weapon at the time of the commission of the crime, states:

In a criminal case wherein there has been a special allegation and evidence establishing that the accused or an accomplice was *armed* with a deadly weapon at the time of the commission of the crime, the court shall make a finding of fact of whether or not the accused or an accomplice was armed with a deadly weapon at the time of the commission of the crime . . . ..

For purposes of this section, a deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instru-

ments are included in the term deadly weapon: . . . pistol, revolver, or any other firearm . . ..

(Italics ours.)

■ The statute authorizes an enhancement only if the defendant was "armed" with a deadly weapon during the commission of a crime. A person is "armed" if a weapon is easily accessible and readily available for use, either for offensive or defensive purposes. *See State v. Sabala*, 44 Wn. App. 444, 723 P.2d 5 (1986) (defendant was armed with a deadly weapon under RCW 9A.04.110(6) when the gun was under his seat in the car he was in, within reach, and thus easily accessible). On this record, evidence that an unloaded rifle was found under the bed in the bedroom, without more, is insufficient to qualify Valdobinos as "armed" in the sense of having a weapon accessible and readily available for offensive or defensive purposes. The trial court therefore erred in relying on the provision of RCW 9.94A.125 permitting a sentence to be enhanced if a defendant is "armed" with a deadly weapon. See count 3, possession with intent to deliver. The sentence enhancement imposed under RCW 9.94A.125 is therefore stricken.[2]

## VIII
### CALCULATION OF THE OFFENDER SCORE

■ Last, Valdobinos argues the trial court erroneously calculated his offender score. He maintains cocaine is not a narcotic drug, and it therefore cannot form the basis of a violation of RCW 69.50.401(a)(1)(i), which requires the substance to be both a scheduled drug and a narcotic. That argument plainly fails an examination of the pertinent statute. Contrary to Valdobinos's assertion, cocaine *is* a narcotic drug under the statute, because it is a derivative of coca leaves. RCW 69.50.101(q) defines narcotic drugs as follows:

> "*Narcotic drug*" means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

---

[2]The trial court also added 12 months to Garibay's sentence on the same grounds. The 12-month sentence enhancement Garibay received under RCW 9.94A.125 is likewise stricken.

. . . .
(4) *Coca leaves* and any salt, compound, *derivative*, or prepa-
ration of coca leaves, and any salt, compound, isomer, deriva-
tive, or preparation thereof which is chemically equivalent or
identical with any of these substances, but not including deco-
cainized coca leaves or extractions of coca leaves which do not
contain cocaine or ecgonine.

(Italics ours.)

ASSIGNMENTS OF ERROR MADE BY GARIBAY

IX

SUFFICIENCY OF THE INFORMATION

Garibay challenges the information filed against him,
arguing it failed to allege the essential element of "guilty
knowledge" as required by this court's decision in *State v.
Boyer*, 91 Wn.2d 342, 588 P.2d 1151 (1979).

A. The Essential Elements Rule
and "Guilty Knowledge"

We have consistently held that charging documents must
include all "essential elements" of the crimes charged and
allege facts supporting each one of those elements. *See State
v. Leach*, 113 Wn.2d 679, 689, 782 P.2d 552 (1989) ("[T]he
'essential elements' rule requires that a charging document
*allege facts supporting every element of the offense*, in addition
to adequately identifying the crime charged.") If a charging
document fails to include all the essential elements of the
charged crime, it is constitutionally insufficient and must be
dismissed. *See State v. Johnson*, 119 Wn.2d 143, 150, 829 P.2d
1078 (1992) (dismissing several charging documents for fail-
ure to charge essential elements).

The essential elements rule is of constitutional magni-
tude, since the notice principle which it embodies is a com-
ponent of due process. *See State v. Kjorsvik*, 117 Wn.2d 93,
100-02, 812 P.2d 86 (1991). However, charging documents
not challenged prior to conviction are generally construed
more liberally than those challenged at trial. *Kjorsvik*, 117
Wn.2d at 103; *State v. Davis*, 119 Wn.2d 657, 661, 835 P.2d
1039 (1992).

In *State v. Boyer*, 91 Wn.2d 342, 588 P.2d 1151 (1979), we
held that "guilty knowledge" was an essential element of the

crime of *delivery* of a controlled substance. That is, the defendant must have been aware of the nature of the substance being delivered. We reasoned in *Boyer* that without this requirement, even postal carriers could be guilty of delivery of a controlled substance if they unwittingly delivered packages containing illegal substances. *Boyer*, 91 Wn.2d at 344.

 The "guilty knowledge" requirement announced in *Boyer* was affirmed and refined in a pair of decisions handed down recently. In one, *State v. Johnson*, 119 Wn.2d 143, 829 P.2d 1078 (1992), we affirmed the basic holding in *Boyer*. In the other, *State v. Sims*, 119 Wn.2d 138, 829 P.2d 1075 (1992), we determined that the "guilty knowledge" requirement did not apply to the crime of *intent* to deliver a controlled substance. We explained that since the very crime of intent to deliver includes a mens rea component, there is no need to impose a further intent requirement of "guilty knowledge".[3] *Sims*, 119 Wn.2d at 142.

### B. Count 3: Intent To Deliver

While Garibay argues that each of the charges against him were flawed, one of the charges is clearly sufficient. First, count 3 of the information charged Garibay with "Possession of a Controlled Substance with Intent to Deliver". In *Sims*, 119 Wn.2d at 142, we specifically held that there is no additional "guilty knowledge" requirement for this offense. Therefore, Garibay's argument with respect to count 3 fails.

### C. Count 2: Conspiracy To Deliver

Although we have never directly addressed the issue of whether the "guilty knowledge" requirement applies to the crime of conspiracy to deliver a controlled substance, our reasoning in *Sims* dictates that it does not. In concluding

---

[3]That holding is consistent with an earlier case, *State v. Wilson*, 95 Wn.2d 828, 631 P.2d 362 (1981), in which we were asked to decide whether the State was required to prove knowledge of the nature of the substance delivered in a prosecution for contracting to deliver a controlled substance under RCW 69.50.401(a). We held that the guilty knowledge element of contracting to deliver a controlled substance could be established by proof of the contract to deliver. Our reasoning there was that it is impossible to contract for the delivery of a controlled substance without knowing what one is doing. *Wilson*, at 834.

there was no "guilty knowledge" element in intent to deliver, we stated: "It is impossible for a person to intend to manufacture or deliver a controlled substance without knowing what he or she is doing." *See Sims*, 119 Wn.2d at 142.

■ Similarly here, we deem it impossible for people to engage in a conspiracy to deliver cocaine without knowing what they are doing. In order to agree to a plan to deliver cocaine, individuals must necessarily be aware that what they are to deliver is cocaine. Garibay's argument with respect to count 2 therefore also fails.

### D. Count 1: Delivery of a Controlled Substance

The sufficiency of count 1 against Garibay presents a more difficult question. While the State concedes that "guilty knowledge" is an essential element of this offense, it argues that the presence of the term "feloniously" gave Garibay notice of the "guilty knowledge" element. Brief of Respondent, at 7-8.

Count 1 stated in pertinent part:

Defendant did feloniously deliver a Schedule II narcotic drug, to-wit: Cocaine . . . to an undercover agent of the North Central Washington Narcotics Task Force.

Clerk's Papers (Garibay) (Information), at 1.

Without reaching the question whether "feloniously" standing alone is equivalent to "guilty knowledge", we conclude the charging document *as a whole* was not deficient in this case.

■ In *State v. Kjorsvik*, 117 Wn.2d 93, 812 P.2d 86 (1991), we adopted the federal 2-part test for applying the essential elements rule: "(1) do the necessary facts appear in any form, or by fair construction can they be found, in the charging document; and, if so, (2) can the defendant show that he or she was nonetheless actually prejudiced by the inartful language which caused a lack of notice?" *Kjorsvik*, 117 Wn.2d at 105-06.

In determining whether the necessary facts are actually alleged in any given charging document, we analyze the language of the charging document from the perspective of a person of "common understanding". *See* RCW 10.37.052;

*Kjorsvik*, 117 Wn.2d at 110; *State v. Davis*, 60 Wn. App. 813, 818, 808 P.2d 167 (1991), *aff'd*, 119 Wn.2d 657, 835 P.2d 1039 (1992). As stated in *State v. Royse*, 66 Wn.2d 552, 403 P.2d 838 (1965), "the information must state the acts constituting the offense in *ordinary and concise* language". (Italics ours.) *Royse*, at 557. Since the chief purpose of the essential elements rule is to notify the defendant of the charges, *Kjorsvik*, 117 Wn.2d at 101, it is necessary to evaluate the document from the perspective of a person of "common understanding" rather than that of a legal expert.

The application of the test in *Kjorsvik* indicates the charging documents in this case were not deficient. In *Kjorsvik*, we held that the term "unlawfully" sufficed to convey the "intent to steal" element of robbery. *Kjorsvik*, 117 Wn.2d at 110. In reaching this conclusion, we examined *all* the language in the information, "reading it as a whole and in a commonsense manner". *Kjorsvik*, at 110-11.

Applying this approach to the various counts in this case mandates a similar result. The information charged Garibay not only with delivery of a controlled substance, but also with conspiracy to deliver a controlled substance and intent to deliver a controlled substance, and alleged facts to that effect. It is inconceivable that Garibay would not have been on notice that he was accused of knowing the substance in question was cocaine. Therefore, reading the information as a whole and in a commonsense manner, the failure to include "guilty knowledge" in count 1 does not render the information constitutionally inadequate.[4]

## X
### PROPRIETY OF THE EXCEPTIONAL SENTENCE

Garibay maintains next that his exceptional sentence was based on insufficient findings of fact and conclusions of law.

---

[4]This case is thus different from *State v. Kitchen*, 61 Wn. App. 915, 812 P.2d 888, *review denied*, 117 Wn.2d 1019 (1991), in which there was no indication the defendants could have been on notice about their knowledge of the product being delivered. *See Kitchen* (reversing the judgment because the informations charging unlawful delivery failed to allege the defendants acted with guilty knowledge of the nature of the product being delivered).

He is incorrect. The stipulated facts on which the trial court relied were lengthy and detailed police reports describing the circumstances under which he was arrested.

Garibay also maintains that, even assuming size is a factor in determining whether a drug operation warrants an exceptional sentence, nothing in the stipulated record below established this was anything other that an ordinary instance of possession. This argument likewise fails.

██ The trial court imposed an exceptional sentence based on the following conclusions of law: Garibay occupied a high position in the drug distribution hierarchy, RCW 9.94A-.390(2)(d)(iv); the offense involved a high degree of sophistication or planning or the offense involved a broad geographic area of disbursement, RCW 9.94A.390(2)(d)(v):

Those conclusions were based on the following findings, which are supported in the record: nearly 2 pounds (846.1 grams) of cocaine were found in the home; the standard amount for street level use of cocaine is one-half gram. Given these findings the assertion that this quantity of cocaine represents a fairly typical instance of possession is unwarranted.

## XI
### WAIVER OF THE RIGHT TO A JURY TRIAL

Finally, Garibay maintains that he did not properly waive his right to a jury trial. The record indicates the contrary:

THE COURT: . . . Mr. Garibay, do you think you understand what is going on here?

MR. GARIBAY: Yes.

THE COURT: You understand that you are waiving, this is giving up, your right to a jury trial? You understand that?

MR. GARIBAY: What do you mean?

THE COURT: That you are giving up your right to the jury trial. You understand that, sir?

MR. GARNETT: Could I have a moment with my client?

THE COURT: You may.

(Mr. Garnett and Mr. Garibay had a conference off the record)

THE COURT: Mr. Garibay, do you now understand —

MR. GARIBAY: Yes.

THE COURT: That you are — you're giving up your right to a jury trial?

MR. GARIBAY: Yes.

288

THE COURT: All right. And you understand that the matter is being submitted to me as the Judge based on the written records? You understand that?

MR. GARIBAY: Yes.

Report of Proceedings (Non-Jury Trial on Stipulated Facts), at 5-6.

■ The right to a jury trial may be waived. *See Bellevue v. Acrey*, 103 Wn.2d 203, 207, 691 P.2d 957 (1984). The record indicates such a waiver occurred here. Moreover, Garibay appears to have acted knowingly and intelligently, because when he was confused he did not answer yes, but instead asked the court for clarification. On this record, the bare allegation that Garibay did not understand what he was doing is insufficient to support the contention he was denied his right to a jury trial.

The convictions of Valdobinos and Garibay are affirmed. The portion of their sentences based on use of a deadly weapon is invalidated.

ANDERSEN, C.J., and BRACHTENBACH, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.