[Nos. 28709-9-II; 28712-9-II. ■■■■■■■ January 13, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. BOBBY G. HOLT, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. LINDA BELLE HOLT, *Appellant*.

*Patricia A. Pethick* and *Thomas E. Doyle*, for appellants.

*Edward G. Holm, Prosecuting Attorney*, and *Steven C. Sherman, Deputy*, for respondent.

BRIDGEWATER, J. — Bobby and Linda Holt were each convicted of two counts of second degree criminal mistreatment and one count of unlawful manufacture of methamphetamine. The unlawful manufacture convictions carried a firearm enhancement and an enhancement for the presence of a person under age 18. Bobby was also convicted of three counts of second degree unlawful possession of a firearm. We affirm the unlawful manufacture convictions and Bobby's second degree unlawful possession convictions. But we vacate the firearm enhancements, holding that the jury must be instructed to find a nexus between the defendant, the crime, and the firearm. Further, because the charging

documents omitted an essential element, i.e., recklessness, we reverse the convictions for second degree criminal mistreatment.

Acting on an informant's tip, police officers arrived at 20104 Neat Road Southeast in Thurston County to investigate a suspected methamphetamine lab. The property, owned by Linda and Bobby Holt, contained several acres. On it were several inhabited trailers and many vehicles in various states of repair.

Earlier in the day, Bobby had returned home from work to find gray smoke coming from a trailer window. He entered to investigate and found Linda, Tammy Woods (Linda's daughter), and another woman engaged in what appeared to be the manufacture of methamphetamine.

At about the same time, two children also arrived at the trailer. The children, Pebbles and Anthony Woods, are Linda's biological grandchildren. At trial, an officer testified that Pebbles appeared to be 12 years old and Anthony appeared to be 7 or 8. Both children had their own bedrooms in the trailer and were cared for primarily by Linda and Bobby.

The officers' search revealed substantial evidence of a methamphetamine laboratory. They seized various chemicals common in the anhydrous ammonia manufacture method, including acetone, xylol, and muriatic acid. They found several items containing a residue that later tested positive for methamphetamine. And inside the trailer's computer room, officers found pseudoephedrine/ephedrine tablets, lithium batteries, a black binder containing pages from the book titled "Secrets of Methamphetamine Manufacturing," three firearms (one of which was loaded with three rounds of ammunition), and a jar containing a yellow liquid. A forensic scientist testified that the yellow liquid was methamphetamine in its final stage of manufacture.

At trial, Bobby, a convicted felon, asserted that he was separated from Linda and did not live in the main trailer,

opting instead for a nearby 26-foot camp trailer. Several defense witnesses corroborated the claim. Bobby also claimed that the firearms seized in the computer room were no longer his, that he had given them to Linda and another friend for safekeeping in the hope that, one day, the guns would pass to Anthony.

The jury convicted on all counts and made positive findings on all enhancements. As to both defendants, the trial court found that the unlawful manufacture and criminal mistreatment convictions encompassed the same criminal conduct. And as to Bobby, the trial court also found that the unlawful possession convictions encompassed the same criminal conduct.

## I. Defective Information

Linda and Bobby both contend that their second degree criminal mistreatment convictions must be reversed and the charges dismissed because their charging documents failed to allege an essential element. The State concedes error and agrees that the charges must be dismissed.

■ ■ The State's concession is proper. The charging documents omitted "recklessly," the required mental state for second degree criminal mistreatment (see RCW 9A-.42.030(1)), and there appears no language in the document that we may construe, even under liberal examination,[1] as imparting the required notice. *Cf. State v. Kjorsvik*, 117 Wn.2d 93, 110, 812 P.2d 86 (1991) (construed liberally, charging document alleging that the defendant *unlawfully* took property by force provided sufficient notice of the intent element of first degree robbery). Therefore, we reverse and dismiss without prejudice the second degree criminal mistreatment convictions for Linda and Bobby. *See State v. Vangerpen*, 125 Wn.2d 782, 792-93, 888 P.2d 1177 (1995).

---

[1] Linda and Bobby both concede that they did not challenge the sufficiency of the charging document before the verdict. *State v. Borrero*, 147 Wn.2d 353, 360, 58 P.3d 245 (2002) (charging documents to be liberally construed when challenged for first time after the verdict).

## II. Jury Instructions on Alternative Means Offense

■■ Bobby next contends that instructions 29, 30, and 31 improperly allowed the jury to convict on an uncharged alternative means of committing second degree unlawful possession of a firearm. Second degree unlawful possession of a firearm is an alternative means offense committed when a convicted felon (1) owns, (2) possesses, or (3) controls a firearm. RCW 9.41.040(1)(b). It is error for the jury to be instructed on and consider uncharged alternatives regardless of the strength of the evidence presented at trial. *State v. Williamson*, 84 Wn. App. 37, 42, 924 P.2d 960 (1996).

■■ The State contends that the invited error doctrine precludes our review of this issue. Under that doctrine, a defendant may not set up an error at trial and then complain of it on appeal. *State v. Studd*, 137 Wn.2d 533, 546, 973 P.2d 1049 (1999). Thus, a defendant may not challenge on appeal a jury instruction that he proposed at trial. *Studd*, 137 Wn.2d at 546. This is true even if the defendant proposed a pattern jury instruction. *Studd*, 137 Wn.2d at 546-47; *State v. Summers*, 107 Wn. App. 373, 381, 28 P.3d 780 (2001).

Bobby's proposed instruction was a pattern instruction— 11A *Washington Practice: Washington Pattern Jury Instruction: Criminal* § 133.02.01, at 354-55 (1994)—requiring proof "[t]hat . . . the defendant [owned a firearm] [or] [had a firearm in his possession or control] . . . [and] [t]hat the [ownership] [or] [possession or control] of the firearm occurred in the State of Washington." Clerk's Papers (CP) at 19.[2] This instruction explicitly allowed a guilty finding on the ownership alternative, and it recommended the exact wording that the trial court ultimately chose. Therefore, Bobby proposed the instruction that he now challenges. By doing so, he is precluded from appealing the alleged instructional error.

---

[2] This and all subsequent references to clerk's papers are referring to Bobby Holt's clerk's papers.

■■■ Even if we reached the alleged error, Bobby's claim fails. Although he correctly asserts that the charging document alleged only the possession and control alternatives, the jury was not instructed that it could find guilt based on ownership, the uncharged alternative. All three to-convict instructions stated,

> To convict defendant . . . of the crime of unlawful possession of a firearm in the second degree . . . each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 4th day of October, 2001, *the defendant knowingly had a firearm in his possession or under his control* . . . ;
>
> (2) That the defendant had previously been convicted of a felony; and
>
> (3) *That the ownership, or possession or control* of the firearm occurred in the State of Washington.

CP at 45, 46, 47 (emphasis added).

The third element was the only one that referenced the ownership alternative. As the State contends, this element was only jurisdictional. It did not enable a finding as to the means of commission. To determine the means of commission, the jury had to look to the first element, which stated only the charged alternatives of possession and control. We presume that the jury followed this instruction. Therefore, the jury was not instructed or allowed to find guilt on an uncharged alternative.

In a related assignment of error, Bobby asserts that the trial court erred by failing to give a unanimity instruction for second degree unlawful possession. He asserts that the error requires reversal because sufficient evidence did not support each alternative.[3] As our previous analysis concluded that the State did not instruct on or charge the

---

[3] Bobby actually asserts that "[t]he *State* failed to elicit sufficient evidence of all the alternatives," suggesting that we should limit our review to the State's evidence. Br. of Appellant (Bobby) at 22. But because Bobby elected to put on evidence in his defense, our review may consider his evidence too. *State v. Jackson*, 82 Wn. App. 594, 608, 918 P.2d 945 (1996) (citing *Jackson v. Virginia*, 443

720

ownership alternative, we need only decide whether sufficient evidence supported the possession and control alternatives.

Failure to give a unanimity instruction in an alternative means case is harmless if sufficient evidence supports each of the alternatives. *State v. Camarillo*, 115 Wn.2d 60, 65, 794 P.2d 850 (1990). Evidence is sufficient if, viewed in the light most favorable to the State, it permits any rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt. *State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993). A claim of insufficiency admits the truth of the State's evidence and requires that all reasonable inferences be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence is accorded equal weight with direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). In reviewing the evidence, we give deference to the trier of fact, who resolves conflicting testimony, evaluates the credibility of witnesses, and generally weighs the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

The trial court did not instruct the jury as to the meaning of control, and chapter 9.41 RCW does not define the term. Therefore, we must give "control" its ordinary, dictionary definition. *See State v. Edwards*, 84 Wn. App. 5, 10, 924 P.2d 397 (1996), *review denied*, 131 Wn.2d 1016 (1997). According to *Webster's II New College Dictionary* 246 (1st ed. 1999), to control is "[t]o exercise authority or influence over."

The trial court did define possession, however:

> Possession means having a firearm in one's custody or control. It may be either actual or constructive. Actual possession occurs when the weapon is in the actual physical custody

U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)), *review denied*, 131 Wn.2d 1006 (1997).

of the person charged with possession. Constructive possession occurs when there is no actual physical possession but there is dominion and control over the item, and such dominion and control may be immediately exercised.

CP at 47.

As sufficient evidence, the State first cites Dewey Hollingshead's[4] testimony that "normally nobody went in [the computer room] unless Bobby was in there. Because it's Bobby's personal stuff." 2 Report of Proceedings (RP) (Mar. 26-29, 2002) at 245. The State also cites testimony given by the officer who took and recorded Hollingshead's pretrial statement, which generally established the same point as Hollingshead's trial testimony: that Bobby controlled the computer room. Finally, the State points to Bobby's pretrial statement that the guns "were his." 2 RP at 341.

 Evidence also established that Bobby lived in the trailer that housed the guns. This point was properly inferable from evidence indicating that Bobby owned the trailer; that Linda, his wife, lived there; and from an officer's testimony that, on several previous occasions, he had been able to contact Bobby at the trailer. Although several witnesses, including Bobby, testified that he lived in another trailer nearby, the jury could have concluded that the testimony was self-serving and drawn the inference that Bobby lived in the trailer with Linda.

Evidence suggesting that Bobby lived in the trailer and controlled access to the specific room that contained the firearms adequately supports the second degree unlawful possession convictions. And though not directly related to possession or control, Bobby's statement that the guns "were his" can only strengthen the inferences from this evidence. 2 RP at 341. Therefore, the trial court's failure to issue a unanimity instruction was harmless error.

---

[4] Hollingshead is a relative who cared for Pebbles and Anthony on the afternoon that officers discovered the methamphetamine lab.

## III. Comment on the Evidence

 Next, Linda and Bobby claim that the to-convict instructions for the second degree criminal mistreatment counts commented on the evidence or charged the jury on a factual issue. We will not review this claim because we have previously dismissed these counts without prejudice. That dismissal also obviates the need to review the trial court's denial of Linda and Bobby's mistrial motion.

## IV. Sufficiency of the Evidence

A. Second Degree Unlawful Possession of a Firearm. As we have already assessed the sufficiency of the evidence as to Bobby's unlawful possession convictions, and because Bobby merely reincorporates the prior argument challenging possession and control, we will not review this claim.

 B. Second Degree Criminal Mistreatment. Although we must dismiss the second degree criminal mistreatment charges, we assess the evidentiary sufficiency on those charges to determine whether the State may retry the defendants. The jury instructions indicated that the essential elements of second degree criminal mistreatment are that the defendant (1) had been entrusted with the physical custody of a child[5] and (2) recklessly created an imminent and substantial risk of death or great bodily harm to the child.

Evidence that Linda and Bobby had been entrusted with Pebbles and Anthony's physical custody was substantial. It established that Linda is the biological grandmother, that the children had lived with her "since they were babies," 2 RP at 205, and that each had a bedroom at the trailer. When the officers arrived, the children's school

---

[5] Linda and Bobby do not assert that Pebbles and Anthony are not children despite their challenge to instructions 21 through 24, which, they claimed, basically withdrew that factual issue from the jury's consideration. Although we need not review the merits of the challenge because the criminal mistreatment charges must be dismissed, any instructional error was harmless. Pebbles and Anthony's minority was clear, and it is not challenged directly on appeal.

books were on the coffee table in the living room, and at some point during the investigation, the children went into the residence to put on coats and to eat dinner. Further, a Child Protective Services investigation confirmed that the children lived with and were cared for by Linda and Bobby; and Alice Hollingshead, Linda's relative and next door neighbor, testified that Linda and Bobby had primary care of the kids. Finally, although Bobby denied much of a relationship with the children, evidence established that he was married to Linda, he owned the trailer, and the jury could have reasonably inferred that he lived in the trailer with Linda and the children. This evidence provided the factual basis necessary for a jury determination that Linda and Bobby had been entrusted with Pebbles and Anthony's physical custody.

Linda and Bobby dispute their entrustment by vaguely asserting that Tammy's presence precludes any entrustment finding because she was the children's mother. We disagree. Though the factual assertions are valid—Tammy was present and is the children's mother—there is no indication that she had wrested physical custody from Linda and Bobby prior to the officers' arrival. The only reasonable conclusion from the trial evidence was that Pebbles and Anthony's physical custody had been entrusted solely to Linda and Bobby at some time well before the charged crimes. Nothing indicates that Tammy ended that entrustment. Therefore, her presence at the trailer was insignificant.

The evidence was also sufficient for the jury to find an imminent and substantial risk of death or great bodily harm to the children. The jury instructions defined great bodily harm as "injury [that] creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily part or organ." CP at 45. Evidence supporting this element consisted of a forensic scientist's testimony that fires and explosions are common in the manufacture of methamphetamine and his state-

ment that the anhydrous ammonia manufacturing method, which Linda and Bobby used, "will eat your lungs out," 1 RP (Mar. 26-29, 2002) at 72. From this, the jury could have found a risk of great bodily harm.

Finally, the crime required proof that Linda and Bobby's conduct in placing the children at such risk was reckless. The jury instructions stated that "[a] person is reckless . . . when he or she knows of and disregards a substantial risk that a wrongful act may occur and the disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." CP at 44.

As to Bobby, evidence on this element consisted of a prior conviction for conspiring to manufacture methamphetamine and a knowledge of the manufacturing processes and of the dangerousness of several of the chemicals used to manufacture methamphetamine—e.g., methanol, muriatic acid, xylol, acetone, and anhydrous ammonia. As to Linda, evidence shows that she was in the process of manufacturing methamphetamine when the children were on the premises. From Bobby's general knowledge of methamphetamine manufacturing and Linda's actual manufacture, the jury could have inferred that the defendants knew, during their manufacture, that their conduct posed an imminent and substantial risk of death or great bodily harm to the children. The evidence was therefore sufficient.

C. Manufacture of a Controlled Substance. Finally, as to the unlawful manufacture of a controlled substance counts, the jury instructions required proof that Linda and Bobby (1) manufactured or were accomplices to the manufacture of methamphetamine and (2) knew that the substance manufactured was methamphetamine.

The State theorized that Linda and Bobby were accomplices to the manufacture of methamphetamine. The instructions defined accomplice as "[a] person [who] . . . with knowledge that it will promote or facilitate the commission of the crime . . . either: (1) solicits, commands, encourages,

or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing the crime." CP at 39. To establish accomplice liability, evidence must indicate more than the defendant's physical presence at the scene and assent to the crime committed. *State v. Roberts*, 80 Wn. App. 342, 355, 908 P.2d 892 (1996). "The State must prove that the defendant was ready to assist in the crime." *State v. Luna*, 71 Wn. App. 755, 759, 862 P.2d 620 (1993).

 "Manufacture means the production, preparation, propagation, compounding, conversion, processing, directly or indirectly, as well as the packaging or repackaging of any controlled substance." CP at 36. To prove the actual, physical manufacture of methamphetamine, a forensic scientist stated that tests conducted on a paper towel and a jar containing a liquid, both of which were recovered from the trailer, revealed the presence of methamphetamine. He further testified that "[t]he liquid is a solvent so it would be consistent with the last step where you wash—have made methamphetamine and added solvent to wash out the container but haven't yet salted it out." 1 RP at 75. He concluded that the liquid sample that he tested was a step in the methamphetamine manufacturing process but that the methamphetamine had not yet been reduced to a solid, usable form. Further, officers recovered from the trailer and nearby property various items necessary for the anhydrous ammonia manufacturing method, including lithium batteries, various chemicals, pseudoephedrine/ephedrine tablets, and reference materials titled, "Secrets of Methamphetamine Manufacturing." 1 RP at 122. From this evidence, the jury could have concluded that methamphetamine was manufactured at the trailer.

 Evidence also proved Linda's complicity in the manufacture. She lived in the trailer where the manufacture occurred; on the day of her arrest, Bobby entered the trailer and found her and several others engaged in what appeared to be the active manufacture of methamphetamine; and while conducting officers through the trailer, she

attempted to hide the jar that later tested positive for methamphetamine. Also, the forensic scientist testified that tests done on powder residue from several other items seized from the trailer were positive for methamphetamine. From this evidence, the jury could have reasonably inferred that Linda was more than merely present; it could have inferred that she aided and encouraged the manufacture of methamphetamine.

Finally, evidence establishing Bobby's complicity was also sufficient. As discussed earlier, a reasonable inference from the evidence was that Bobby lived in the trailer where the methamphetamine was manufactured. Thus, the forensic scientist's testimony establishing that various items in the trailer tested positive for methamphetamine applies equally to Bobby. And though he makes much of his testimony describing other legal uses for the various chemicals found on the property—i.e., xylene, muriatic acid, acetone—the chemicals are ingredients for manufacturing methamphetamine as well. The jury could therefore have disbelieved Bobby's version on the utility of these chemicals, choosing instead to infer that Bobby used the chemicals to manufacture methamphetamine. These circumstances provide sufficient evidence for the jury to have reasonably concluded that Bobby aided and encouraged the manufacture of methamphetamine.

## V. Enhancement Instructions and Sufficiency of the Evidence

Linda and Bobby next challenge the instructions defining their sentence enhancements. They argue that the enhancement instructions should have explained that the State bore the burden of proving a nexus between them, the methamphetamine manufacture, and (1) the firearm and (2) the presence, on the premises, of a person under age 18.

For purposes of the firearm enhancement, a person is "armed" "if a weapon is easily accessible and readily available for use, either for offensive or defensive

purposes." *State v. Valdobinos*, 122 Wn.2d 270, 282, 858 P.2d 199 (1993). But a firearm enhancement also requires proof that a nexus existed between the defendant, the weapon, and the crime. *State v. Schelin*, 147 Wn.2d 562, 574, 55 P.3d 632 (2002). It is this latter requirement that Linda and Bobby contend should have been set forth to the jury.

Linda and Bobby cite *State v. Schelin* in support. As *Schelin* did not involve an enhancement for the presence of a person under the age of 18, we reject the claim that it required a nexus between Pebbles and Anthony and the crime of manufacturing methamphetamine. *Schelin*'s only relevance is with respect to the firearm enhancement.

*Schelin*'s majority opinion did not specifically require that firearm enhancement instructions set forth the nexus requirement. It merely discussed the definition of "armed," reaffirming that a nexus must exist between the weapon and the defendant and the weapon and the crime. But because Schelin's claim was different—i.e., a sufficiency of the evidence challenge rather than a challenge to the adequacy of the "armed" instruction[6]—we do not take the majority's silence on the present issue as an implicit pronouncement on the issue's merits. Instead, we recognize that the majority's position would be consistent with a holding that instructions defining the firearm enhancement must set forth the nexus requirement.

Justice Alexander was more to the present point when he noted, in concurrence, that he would have required the State "to affirmatively prove beyond a reasonable doubt that there is a nexus between the defendant, the crime, and the deadly weapon" had Schelin challenged the adequacy of the armed instruction. *Schelin*, 147 Wn.2d at 577 (Alexander, C.J., concurring). Justice Alexander recognized, though, that such a holding was unnecessary due to the nature of Schelin's claim.

---

[6] *Schelin*'s instruction defining "armed" was the same as Linda and Bobby's. All instructions defined the term consistently with *Valdobinos*.

Justice Alexander's position suggests that a nexus between the defendant, the crime, and the weapon is neither an idle trial formality nor solely an appellate standard for ensuring justly imposed firearm enhancements. The nexus is, instead, an *element* of the enhancement requiring supportive proof beyond a reasonable doubt. Were this untrue, appellate courts would have no cause to inquire on the sufficiency of the evidence supporting the nexus. *See State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (a sufficiency of the evidence challenge requires proof of only the crime's essential elements). But because appellate courts often perform that precise inquiry, we see no reason to deny the nexus requirement its status as an element of the enhancement.

We conclude that, as an element of the firearm enhancement, the nexus requirement must be set forth in the jury instructions. Because the enhancement instructions in this case did not,[7] they inaccurately stated the law.

■ This instructional error essentially relieved the State of the burden of proving the nexus beyond a reasonable doubt. It was, therefore, a fatal error requiring reversal regardless of the strength of the evidence on the point. *See State v. Eastmond*, 129 Wn.2d 497, 503, 919 P.2d 577 (1996) (instructional error that relieved the State of its burden of proving an essential element was fatal). We therefore reverse Linda's and Bobby's firearm enhancements.[8]

---

[7] We note that the nexus element is not satisfied by merely having a firearm easily accessible and ready for offensive or defensive use. Instead, the firearm must also be shown to have some rational connection to the charged crime, e.g., protecting a methamphetamine laboratory. *See Schelin*, 147 Wn.2d at 572 ("A deadly weapon must be accessible and readily available, *and* a nexus must be established between the defendant (or an accomplice) and the weapon, and the crime.") (emphasis added).

[8] Because we reverse the firearm enhancements, we need not address the alleged errors relating to the special verdict forms that were resubmitted to the jury or whether the trial court may impose two enhancements consecutively based on one underlying offense. We also do not address the alleged ineffective assistance of counsel claim as it is based upon (1) a failure to object to the "armed" instruction that omitted the nexus requirement, (2) a failure to propose a correct

As to Linda and Bobby's sufficiency of the evidence claim, we hold that the evidence was sufficient for the enhancement relating to the presence of a minor during the manufacture of methamphetamine. Taken in the light most favorable to the State, the jar seized in the computer room—i.e., the jar that Linda knocked over when showing officers through the trailer—contained a liquid that tested positive for methamphetamine but was not yet reduced to a solid, usable form. The forensic scientist confirmed this theory. Evidence further showed, in a light favorable to the State, that the children lived at the trailer, they arrived at the premises[9] immediately after Bobby discovered Linda and others manufacturing what appeared to be methamphetamine, and they were present when the officers arrived. From this evidence, the jury could have reasonably concluded that a person under the age of 18 was present during the methamphetamine manufacture.

STATE'S CROSS-APPEAL

The State claims that the trial court erred by finding that all of Linda and Bobby's convictions constituted the same criminal conduct. But the claim does not implicate the trial court's finding that Bobby's second degree unlawful possession convictions constituted the same criminal conduct.

Our several dispositions above render analysis on the State's cross-appeal unnecessary. Without the second degree criminal mistreatment conviction or the firearm enhancements, the remaining convictions bear no similarity in terms of intent, victim, or time and place of commission.

Affirmed in part, reversed in part, and remanded for resentencing consistent with this opinion.

HOUGHTON and ARMSTRONG, JJ., concur.

---

definition of "armed," and (3) a failure to object when the trial court imposed consecutive enhancements on one underlying offense.

[9] Instruction 16, which is unchallenged, defined "[p]remesis" [sic] as "any building, dwelling, structure, or real property." CP at 40.