IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32808-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LYNN L. JACKSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Lynn Jackson appeals his conviction for attempted second degree rape of a child while armed with a firearm, arguing that recording of a phone call placed from Idaho violated his rights under the Privacy Act, chapter 9.73 RCW. No evidence derived from that telephone call was offered at trial and his effort to raise a derivative evidence argument for the first time on appeal is not properly before us. We affirm the conviction.

FACTS

Mr. Jackson was engaged to marry DM. She had a 13-year-old daughter, MM. The charged incident occurred on March 15, 2014. That day Mr. Jackson drove MM from her mother's house in Pullman to a house he owned in Clarkston. The house was one that he had purchased to repair and re-sell. Only two rooms were furnished. MM went in the bedroom to use the computer.

Mr. Jackson came in and laid down on the bed, saying that he had a headache. He asked MM to join him on the bed. She got on the bed and played a game on her telephone. He started tickling her and she fell off the bed to the floor. There she saw a handgun. Mr. Jackson got up, locked the door to the bedroom, and picked the gun up. He threw[1] the child onto the bed and put the gun next to her. He climbed into the bed and started kissing her chest and put his hand under her shirt. She objected and tried to push him off; he told her that he had not planned on doing anything, but he could not help himself. He then asked how she would react if he raped her. MM continued to struggle. Mr. Jackson started crying and got off her. He took the gun and handed it to MM, asking her to shoot him. She refused and pushed the gun back at him. After both calmed down, they left the house to shop. MM did not report the incident because she knew it would prevent her mother from marrying Mr. Jackson.

Mr. Jackson had set a game camera up in the bedroom to periodically take pictures of activities on the bed. Much of the encounter with MM was captured by the camera and downloaded to a computer. At trial, MM described what was happening in the pictures.[2]

---

[1] The trial judge later described this as a "body-slam." Report of Proceedings at 265. The judge also noted that the entire incident lasted nearly an hour.

[2] The camera also captured sexual encounters between Mr. Jackson and three women, one of whom was DM. None of those photographs were used at trial.

2

DM, MM, and Mr. Jackson went to Las Vegas for the older couple to marry on April 1. That morning, Mr. Jackson was alone with MM and told her that if he married DM, he would end up raping MM and encouraged her to tell that to her mother. The child then told her mother at breakfast about the threat and disclosed information about a series of sexual encounters over the years. The wedding was called off and DM returned to Pullman with her daughter on April 3. Prior to leaving Las Vegas, she called attorneys on the advice of her sisters. One of the attorneys then arranged for the two to have a joint meeting with both Idaho and Washington detectives in Lewiston, Idaho, on April 4.[3]

Present to meet with the pair were Detective Jackie Nichols of the Asotin County Sheriff's Office, a victim advocate from Asotin County, and Lewiston Police Department Detective Jason Leavitt. MM preferred to talk solely with the female detective, so Detective Nichols interviewed her while Detective Leavitt spoke with DM. Leavitt requested that DM call Mr. Jackson to talk about the incidents when MM was younger in Lewiston and record the conversation in the detective's presence. Detective Nichols was advised about the plan and told DM to avoid any discussion of incidents in Washington. DM and Mr. Jackson spoke with Leavitt listening in and passing notes to DM suggesting questions to ask. Detective Nichols in the other room could "basically hear" what was going on. Report of Proceedings (RP) at 164-165.

---

[3] The disclosures indicated that some of the encounters occurred in Lewiston where the family had lived when MM was younger. Clerk's Papers at 3.

3

After the telephone conversation and the interview with MM were complete, the two detectives went to Mr. Jackson's house in Clarkston and spoke with him. He agreed to allow the interview to be recorded. He told the detectives that he had fallen in love with MM and had asked her on March 15 what she would do if he attempted to rape her. When she began crying, he let go of her wrists and handed her a gun and asked her to shoot him. She threw it away. He also discussed earlier incidents in Washington and Idaho that MM had discussed with the detective.

Charges of attempted second degree child rape and second degree assault, both alleged to have been committed while armed with a firearm, were filed in Asotin County Superior Court. Mr. Jackson waived his right to a jury trial and the matter was set for bench trial. Prior to the trial, the defense filed several motions in limine. Included in the motions were requests that the recording of the conversation between DM and Mr. Jackson not be played at trial because it was made in violation of RCW 9.73.030 and that the State's witnesses not discuss the contents of the conversation. The parties debated whether DM was acting as an agent of the State of Washington when she placed the phone call. The court reserved its ruling on those two motions to trial, although the prosecutor indicated he would not be playing the recording because it was too long.

DM testified at trial concerning the circumstances of the phone call she made to Mr. Jackson. When the prosecutor asked for a preliminary ruling that DM could testify to the contents of the conversation, the trial judge indicated not "at this time." The State

4

then ceased its questioning of DM and did not call Detective Leavitt. The contents of the conversation were not admitted at trial.

Detective Nichols did testify concerning her interviews of both MM and Mr. Jackson. She was the third and final witness for the State. Mr. Jackson took the stand in his own defense as the sole defense witness. He admitted asking the rape question of MM and pushing her onto the bed, but denied that anything else occurred. When he saw that she was crying, he pulled the loaded gun out from under the covers and asked her to shoot him. He also confirmed that the incident ended after he realized that he just could not go forward with it. "I could not hurt her." RP at 204.

The trial court convicted Mr. Jackson as charged of attempted second degree child rape while armed with a firearm. The court also convicted him of the included offense of fourth degree assault. Findings of fact and conclusions of law were entered in support of the bench verdict. CP at 106-110. A standard range minimum term sentence was imposed. Mr. Jackson then timely appealed to this court.

## ANALYSIS

Mr. Jackson presents multiple challenges to the admission of his statements to the detectives during the interview at his house. We treat those challenges as one and decline

to consider them. We then consider Mr. Jackson's remaining challenge to the evidence

supporting the firearm enhancement.[4]

*Law Enforcement Interview*

Mr. Jackson argues that his interview with the two detectives should have been

excluded from evidence. He points out that there was no CrR 3.5 hearing and also

contends that Detective Nichols eavesdropped on the telephone call in violation of RCW

9.73.030 and violated his rights under the Privacy Act. He did not seek this relief in the

trial court nor make any of these arguments. There is no manifest constitutional issue

presented by his challenges, nor is there a factual basis to consider them in this court.

RAP 2.5(a) sets forth the general policy of this state—appellate courts will not

consider arguments not first presented to the trial court. *State v. Scott*, 110 Wn.2d 682,

685, 757 P.2d 492 (1988). However, RAP 2.5(a)(3) permits a party to raise initially on

appeal a claim of "manifest error affecting a constitutional right." This authority is

permissive; an appellate court will refuse to consider constitutional issues if the record is

not sufficient to permit review of the claim. *State v. McFarland*, 127 Wn.2d 322, 899

P.2d 1251 (1995).

---

[4] Mr. Jackson also submitted a letter complaining about his trial counsel that has been treated as a statement of additional grounds. The document, however, contains evidence outside the record that is inappropriate for our review. RAP 10.10(c). Mr. Jackson's remedy is to file a personal restraint petition if he desires consideration of evidence outside the trial record. *State v. McFarland*, 127 Wn.2d 322, 338 n.5, 899 P.2d 1251 (1995).

6

Mr. Jackson's primary problem is that he did not challenge the admission of the interview at trial. Indeed, much of his cross-examination of Detective Nichols was designed to elicit his own statements from that interview. RP at 166-171. Thus, even without considering issues of invited error, he can only obtain review of this issue if he can establish a manifest constitutional error in the admission of the statements.[5] He is unable to do so.

Mr. Jackson points out that there was no CrR 3.5 hearing and no evidence that he was afforded his *Miranda*[6] warnings at the interview. However, CrR 3.5 was designed to implement the constitutional right to challenge an involuntary statement; compliance with the rule is not itself a constitutional issue. *State v. Williams*, 137 Wn.2d 746, 749-755, 975 P.2d 963 (1999). Thus, the failure to hold a CrR 3.5 hearing does not make a defendant's statement inadmissible. *State v. Vandiver*, 21 Wn. App. 269, 272, 584 P.2d 978 (1978); *State v. Mustain*, 21 Wn. App. 39, 42-43, 584 P.2d 405 (1978). As *Williams* also noted, a CrR 3.5 hearing is not required in bench trials since a judge presumably will

---

[5] In light of Mr. Jackson's decision to testify, the interview statements would have been usable to impeach any contrary testimony even if they had been suppressed in the State's case-in-chief. *Harris v. New York*, 401 U.S. 222, 225, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971). Accordingly, it is difficult to imagine that any error here could have harmed Mr. Jackson.

[6] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

No. 32808-2-III
*State v. Jackson*

only consider admissible evidence. 137 Wn.2d at 752 (citing and quoting *State v. Wolfer*,

39 Wn. App. 287, 292, 693 P.2d 154 (1984)).

Accordingly, the failure to conduct a CrR 3.5 hearing does not alone present a

constitutional issue. Although the State should schedule and hold a hearing whenever it

desires to use a defendant's statement at trial, the failure to conduct such a hearing is not

a basis for challenging on appeal the admission of a defendant's statement that was not

challenged at trial.[7]

Mr. Jackson's remaining arguments fare no better. As both derive from alleged

violations of the Privacy Act, neither presents a manifest constitutional issue. Moreover,

he has not shown that any violation of the Privacy Act occurred or that his interview with

the officers was itself the poisoned fruit of his earlier telephone call with DM. We need

only summarily note the problems with his arguments.

First, Detective Nichols did not violate the Privacy Act merely by overhearing

from the other room portions of the telephone call between DM and Mr. Jackson. Our

court has previously determined that even the intentional listening in on a telephone

conversation by an officer does not violate the Privacy Act, nor does it violate the

---

[7] There also is no basis for believing that the statement was not voluntarily given.
The rights afforded by *Miranda* apply only to a person undergoing custodial interrogation.
A person is in custody when his freedom of action is curtailed to the degree associated
with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed.
2d 317 (1984). That did not happen here. Mr. Jackson was interviewed at his home and
was not arrested. His situation cannot be likened to a formal arrest.

8

constitution. *E.g., State v. Corliss*, 123 Wn.2d 656, 662-664, 870 P.2d 317 (1994).[8] There is even less of an argument under these facts because Detective Nichols was not intentionally listening to the conversation, even though she could hear much of it from the other room while she was attending to her own duties.

Second, while appellant properly recognizes that the scope of the exclusionary rule flowing from the Privacy Act is greater than that afforded by the constitution, that fact does not help him here. He can only get review of this issue if it is of constitutional magnitude. He presents no basis for considering a violation of RCW 9.73.030 for the first time on appeal. If there was a constitutional violation, then the constitutional exclusionary rule would apply. He cannot claim a violation of the constitution in order to raise an issue for the first time on appeal and then claim a statutory remedy that is not before the court. His attempt to meld these two approaches into one is utterly without merit.

Accordingly, we decline to consider his contention that his statements to the two detectives should not have been admitted at trial. He did not challenge them below, offered many of them himself during cross-examination of Detective Nichols, and has not

---

[8] Even after the adoption of the Privacy Act, our court noted that the constitutional issue had been settled in a series of cases in the 1960s. One party to a conversation may consent to have another person listen to the conversation without violating the constitutional right to privacy. *See State v. Salinas*, 119 Wn.2d 192, 197, 829 P.2d 1068 (1992) (discussing *State v. Goddard*, 74 Wn.2d 848, 447 P.2d 180 (1968); *State v. Wright*, 74 Wn.2d 355, 444 P.2d 676 (1968); *State v. Jennen*, 58 Wn.2d 171, 361 P.2d 739 (1961)).

shown any manifest constitutional question is presented by his belated arguments. The trial court did not err in allowing the statements into evidence.

*Sufficiency of Evidence Supporting Firearms Enhancement*

Mr. Jackson's other argument is more substantial. He contends that the evidence did not support the bench verdict concluding that he was armed with a firearm during the commission of the attempted second degree child rape. Properly viewed, the evidence supported the trial judge's determination.

Familiar standards govern this inquiry. We review such challenges to see if there was evidence from which the trier of fact could find each element of the offense proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Green*, 94 Wn.2d 216, 221-222, 616 P.2d 628 (1980). The reviewing court will consider the evidence in a light most favorable to the prosecution. *Jackson*, 443 U.S. at 319; *Green*, 94 Wn.2d at 221-222. Reviewing courts also must defer to the trier of fact "on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-875, 83 P.3d 970 (2004).

Mr. Jackson does not challenge the attempted rape conviction itself, but only the firearms enhancement. The enhancement applies when a felony offense is committed by a person "armed" with a firearm. RCW 9.94A.533(3). A person is armed when "a weapon is easily accessible and readily available for use, either for offensive or defensive

10

purposes." *State v. Valdobinos*, 122 Wn.2d 270, 282, 858 P.2d 199 (1993). There should be little question but that placing a loaded gun next to the victim at the time of the assault showed that the weapon was "readily available" to the defendant. It was easily accessible to him.

However, Mr. Jackson contends that there needed to be a showing of a nexus between his possession of the firearm and the crime. He is mistaken. Nonetheless, the evidence also amply demonstrated the connection between the gun and the attempted rape.[9]

Whenever a firearm enhancement is based on constructive possession of the weapon, there must be a showing of a nexus between the gun, the crime, and the defendant. *E.g.*, *State v. Brown*, 162 Wn.2d 422, 431-432, 173 P.3d 245 (2007); *State v. Schelin*, 147 Wn.2d 562, 567-568, 55 P.3d 632 (2002). That rule does not apply to situations of actual possession of a firearm during a crime. *See*, *State v. Hernandez*, 172 Wn. App. 537, 544-545, 290 P.3d 1052 (2012), *review denied*, 177 Wn.2d 1022 (2013) (discussing cases). Even if there were a nexus requirement in this case, however, it was

---

[9] Mr. Jackson argued in his initial brief that the acquittal on the second degree assault count was inconsistent with the finding that he was armed with the firearm. It was not. To commit second degree assault with a weapon, he had to use the weapon as the instrument of the assault. RCW 9A.36.021(1)(c). He did not point the gun at MM or otherwise menace her with it, thus the judge acquitted him on that count. In contrast, the weapon only needed to be readily available to constitute being "armed" with the weapon for enhancement purposes. That was the case here.

easily satisfied. Throwing a child on a bed and placing a loaded firearm beside her prior to commencing his sexual assault is ample evidence of a nexus between the defendant, the weapon, and the crime. He had no need to retrieve the gun from its location (either under the bed, according to the victim, or under his pillow, according to the defendant) and place it beside the victim other than to show her its presence and intimidate her into complying with his advances. The weapon was used to facilitate the crime. The trial judge correctly concluded that the weapon was used in the commission of the offense.

The evidence supported the determination that Mr. Jackson was armed with a firearm when he attempted to rape MM. There was no error.

The conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Fearing, J.

_____
Siddoway, C.J.

12