[No. 33883-8-I.  Division One.  January 16, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. DIRK ROBERTS, *Appellant*.

*Rita J. Griffith* of *Washington Appellate Defender Association*; and *Nielsen & Acosta*, for appellant.

344

*Norm Maleng, Prosecuting Attorney,* and *Peter J. Stokstad, Deputy,* for respondent.

KENNEDY, J. — Dirk Roberts appeals his conviction of one count of possession of marijuana with intent to deliver or manufacture. Police found a marijuana grow operation in the basement of the home Roberts rented. Roberts claimed at trial that the grow operation belonged to a subtenant, John Sylvester. Roberts argues that the trial court denied him the right to present this defense by excluding testimony from three witnesses, and by sustaining a hearsay objection to part of Roberts's testimony related to this defense.[1]

We agree that the trial court's rulings prevented Roberts from presenting his defense. The trial court excluded Roberts's evidence on two grounds: (1) the testimony was not probative, as it did not relate to the relevant time frame; (2) the testimony did not negate the evidence that Roberts exercised dominion and control over the premises by virtue of his role as landlord to John Sylvester. The first ground is unsupported by the record, given testimony from a State's witness that the plants could have been in the basement during the time period that Roberts intended to discuss through one of his wit-

---

[1]Roberts also claims that the prosecutor committed prejudicial misconduct by arguing, during closing, that Roberts could be convicted as an accomplice, and that defense counsel provided prejudicial ineffective assistance by failing to object to the prosecutor's improper closing argument. Because we are reversing on other grounds, we need not address the ineffective assistance claim. We do address the prosecutorial misconduct claim, in order to provide guidance for the new trial.

nesses. Further, evidence that the grow operation did not exist before Sylvester subleased the basement is probative of whose grow operation this was. The second ground fails as a matter of law. Whether Roberts sublet the basement to Sylvester, thereby giving up dominion and control over the recreation room where the grow operation was located, presented a jury question. A landlord, knowing that a tenant possesses contraband but failing to evict the tenant, does not, by that failure, exercise dominion and control over the contraband. Moreover, dominion and control over the premises raises a rebuttable presumption of constructive possession of contraband found therein, but does not establish dominion and control over the contraband as a matter of law.

The trial court also erred in preventing Roberts from testifying to the content of a threat allegedly made by Sylvester. The content was offered to show its effect upon the listener, Roberts, and was not hearsay.

Accordingly, we reverse and remand for a new trial.

## FACTS

On March 30, 1993, Seattle Police executed a search warrant at Roberts's address. Roberts's girlfriend, Marsha Dougherty, was the only one present in the house when the police arrived. In the basement, the police found marijuana plants in various stages of growth, high powered lights and ballasts, plant cuttings, stems and stalks, and a ventilation system connected into the fireplace.

The State charged Roberts and Dougherty with possession of marijuana with intent to deliver or manufacture.

At trial, Sergeant Bray testified to having raided numerous grow operations. Bray described the number of plants found growing in the basement of Roberts's home, ranging from starter plants to fully mature, budding plants. Bray next described the growing cycle for marijuana, from seeds to fully mature plants: the process takes about four

months. On cross-examination, Bray admitted that the mature plants found in Roberts's basement could have been four months old or older, based on their size. The plants could have been anywhere from four to seven months old, depending on the type of care the plants had received. The court recessed after this testimony.

The next day, before Bray resumed the stand, the State moved to exclude the testimony of three witnesses on the defense list, Bill Mahoney, George Long, and Doug Wood. Mahoney had initially lived with Roberts in the house, but later had moved. He would testify that the grow operation did not exist during his tenure as a cotenant. Long had lived with Roberts after Mahoney moved out, staying until August or September 1992. He, too, would testify that the grow operation did not exist during his tenure. Wood visited Roberts for one week at Thanksgiving, in November 1992. He would testify that during his stay Roberts told him to stay out of the basement, as it was not Roberts's part of the house. The State argued that none of these witnesses resided in or visited the house during the relevant time period, i.e., from December 1, 1992, to March 30, 1993, the four months before the raid during which marijuana planted from seed would have matured to the stage of budding plants.

The court agreed with the State, ruling that these witnesses had not been in the house during the relevant time; therefore, their proposed testimony was not probative of any issue in the case.

Bray then resumed the witness stand and detailed the remaining evidence of the grow operation. The police found harvested marijuana cuttings, stems and stalks. They also found halide lamps and electricity ballasts needed to operate the lamps from a regular household AC outlet. A ventilation system was hooked into a chimney. All of the basement windows were boarded up and covered with plastic sheeting. The walls of the recreation room in the basement were covered with a reflective coating, and reflector panels were placed to shed more light on the

plants. The laundry room, which contained some plants, was located in the basement.

The police also found clipboards with notes on them regarding the grow operation. The police performed no handwriting analysis on the notes. They did not search for fingerprints around the grow operation. Some of the notes on the clipboard indicated dates in August and September 1992.[2] Based on the clipboard and the fact that the grow operation apparently began as early as August, defense counsel moved again to admit the testimony of Doug Wood that Roberts did not use the basement during the week of Thanksgiving. The court ruled that the testimony was not probative of whether Roberts had dominion and control over the operation during the relevant period.

Upstairs, the police found numerous plastic baggies inside one another, wire scrapers, and some pipes for smoking. The baggies and pipes smelled of marijuana. One baggy contained some marijuana. The police also found a Polaroid picture of numerous marijuana plants and a .44 caliber revolver. Bray testified that baggies and guns were typically found at grow operations. Finally, the police confiscated mail sent to both Marsha Dougherty and Roberts at that address. Bray acknowledged that the police found little cash and no bank books.

After the State rested, Dougherty moved for dismissal of all charges against her, arguing that mere proximity to the operation did not establish criminal liability. The court agreed, stating:

> Let's assume that Mr. Roberts had a roommate that he didn't have any relationship with, they weren't boyfriend and girlfriend. He had a third roommate who occupied that other upstairs bedroom. That roommate wasn't on the lease, but had every other access that you cover to the upstairs part of the house. Would that person have dominion and control over a marijuana grow operation in the basement that belonged either to Mr. Roberts or to some other person who was a subtenant of Mr. Roberts?

---

[2]For instance, one of the notes read: "Monday, the 21st of September . . . fifty cuttings . . . all smaller than usual." Report of Proceedings at 132.

> It seems to me that person would not have dominion and control, *because that person wouldn't have any authority to kick that person out of — the person who was running the grow operation, be it Roberts or some third party, out of the basement, and that's what I think is intended by dominion and control.*

Report of Proceedings at 300-01 (italics ours). The State argued that Dougherty's access to the open laundry room was circumstantial evidence of her knowledge of and aid to the operation. The court disagreed, noting:

> Even if she did do her laundry there, that would mean she had knowledge of the operation, but absent watering the plants or doing something with the plants, I don't know that passing in a room that had them in it would give her dominion and control over the plants. If there was evidence she so much as put a drop of water on one plant, that would certainly be sufficient to say dominion and control. That's someone who is actively engaged in the criminal endeavor, but I haven't heard any such evidence in this case.

Report of Proceedings at 304.[3]

Roberts testified that he originally leased the house with Bill Mahoney. After Mahoney moved, George Long stayed at the house periodically while separating from his wife. Roberts then subleased the basement of the house to an acquaintance from the Blue Moon Tavern named John Sylvester. Sylvester did not sign a rental agreement, but did pay the rent on time every month, and did pay his agreed share of the electricity bill. Sylvester sometimes slept in the basement and sometimes did not.[4] He utilized the garage entrance to the basement, and came and went as he pleased through that entrance.

According to Roberts, Sylvester put new locks on the doors to the basement without giving Roberts a key.

---

[3]The parties do not dispute that the court also heard no evidence that Roberts ever watered, harvested or otherwise cared for the plants.

[4]A police officer testified at trial that a sleeping bag was found in the recreation room in the basement.

Because this prevented Roberts from using the laundry room located in the basement he protested, and Sylvester began leaving that access door unlocked, though he continued to have the only key to the door of the basement located in the garage.

After discovering that Sylvester had boarded up the basement windows, Roberts asked him to move out. Sylvester agreed only after learning that Roberts's landlord would conduct a walk-through inspection in May. But Sylvester seemed in no hurry to vacate the premises. While Sylvester was still there, Roberts saw some marijuana plants in the laundry room, and on three occasions Roberts visited the recreation room while Sylvester was there, seeing the grow operation. He asked Sylvester some questions regarding the plants. He also renewed the request that Sylvester move out.

Roberts collected the rent for October through March, despite knowing of the grow operation. Roberts also paid two-thirds of the utility bill, as agreed to by Roberts and Sylvester, except that in a particular month when the bill was higher than usual, Roberts asked Sylvester to pay half the bill, and Sylvester did so.

Roberts admitted to smoking marijuana occasionally, but denied having anything to do with Sylvester's grow operation. Roberts said that he did not go to the police to report the operation because he feared that Sylvester would vandalize his property. When defense counsel asked what if anything Sylvester had said to cause this fear, the State objected on hearsay grounds, which objection the trial court sustained.

George Long testified that there were no locks on the doors to the basement when he stayed at the house in September 1992. Long stated that he knew John Sylvester from the Blue Moon Tavern, where Long tended bar. The court sustained an objection by the State when defense counsel asked Long whether he had seen any marijuana plants in the basement during his time in the home.

Bill Mahoney testified that he saw a man meeting

Roberts's description of John Sylvester when he was help-ing Roberts move out, in March 1993. Mahoney also confirmed the absence of any locks on doors to the base-ment during his time at the house.

At closing argument, the prosecutor argued that suf-ficient circumstantial evidence existed to convict Roberts as the principle behind the grow operation. She added, however, that he could be found guilty as an accomplice, even assuming that John Sylvester existed, because "aid" meant "any and all assistance given by words, acts, encouragement, support and presence." Report of Proceed-ings at 319.[5] She argued that Roberts allowed Sylvester to use the basement, accepted rent, paid part of the utility bill, did not throw Sylvester out or change the locks, did not destroy the plants, and went into the grow rooms and had discussions with Sylvester about the plants.

The jury found Roberts guilty, and this timely appeal followed.

DISCUSSION

I

CONSTRUCTIVE POSSESSION

Roberts contends that the trial court's ruling that his witnesses' proposed testimony was irrelevant because not within the proper time frame denied him the constitu-tional right to present a defense. He also argues that the trial court's implicit holding that Roberts had dominion and control over the grow operation by virtue of his posi-tion as Sylvester's landlord violated Roberts's right to present a defense and to testify on his own behalf.

■ The right to compulsory process includes the right to present a defense. *State v. Burri*, 87 Wn.2d 175, 181, 550 P.2d 507 (1976). Washington defines the right to pre-sent witnesses as a right to present material and relevant

---

[5]The jury was instructed on accomplice liability, without defense objection.

testimony. *See State v. Smith*, 101 Wn.2d 36, 41, 677 P.2d 100 (1984). The defense bears the burden of proving materiality and relevance, i.e., that the defense has a "colorable need" for the witness. *Smith*, 101 Wn.2d at 41.[6]

The right to testify allows a defendant to give relevant, admissible evidence. *See State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983); *State v. Rehak*, 67 Wn. App. 157, 163, 834 P.2d 651 (1992), *review denied*, 120 Wn.2d 1022, *cert. denied*, 113 S. Ct. 2449 (1993). Roberts bears the burden of establishing the relevance and admissibility of the proposed testimony. *Rehak*, 67 Wn. App. at 162; *Smith*, 101 Wn.2d at 41.

Here, to be material and relevant, the testimony Roberts wished to offer must involve a period of time relevant to the existence of this grow operation and support a viable defense to constructive possession of the grow operation.

## A. Marijuana Growing Cycle

The trial court concluded that the proffered testimony from Wood, Mahoney, and Long all involved a time period before the four-month period preceding the date the operation was raided. Because, according to Sergeant Bray, the plants required only four months to reach maturity, periods of time before that were irrelevant.

But Bray testified that marijuana's *normal* growing cycle from seed to mature plant lasted about four months. Bray also acknowledged that the plants taken from Roberts's basement could have been anywhere from four to seven months old. The State also presented clipboards indicating the existence of the grow operation as early as August and September, six and seven months before the raid on Roberts's home, as well as evidence that some plants had been harvested before the raid. After Bray

[6]In *Smith*, the defendant raised an entrapment defense and sought to present testimony from a witness supporting this defense. Because the court concluded the defense must fail as a matter of law, the excluded witness's testimony was unnecessary, and the defendant failed to prove the materiality of the evidence. *Smith*, 101 Wn.2d at 44.

finished testifying, Roberts renewed his request to submit Wood's testimony that Roberts told him in November to stay out of the basement as that was not Roberts's part of the house. The trial court erred in refusing Roberts's request on the ground that the evidence did not fall within the relevant time period. The court also erred in prohibiting Long and Mahoney from testifying that while they lived there, before Sylvester, they saw no grow operation. This testimony makes it more likely that the grow operation did belong to Sylvester.[7]

▆ It was also error for the trial court to preclude Roberts from testifying to the content of Sylvester's alleged threat. Roberts's testimony that Sylvester threatened him was relevant to a fact in issue—why, if this was Sylvester's grow operation and not Roberts's, did Roberts not call the police? Roberts's state of mind at the time of the grow operation was thus relevant to the ultimate issue at trial: Whose grow operation was this? Roberts testified without objection that he did not call the police because he feared that Sylvester would vandalize his property if he did so. Whether Sylvester actually threatened Roberts, indeed, whether Sylvester existed at all, was a question of fact inextricably related to the question of Roberts's credibility. Roberts's credibility related at least in part to the reasonableness of his failure to call the police, if this were, indeed, Sylvester's grow operation. The content of the alleged threat was not hearsay, as it was offered not to prove that Sylvester intended to carry out the threat, or even that Sylvester necessarily made the threat, but only to show (should the jury believe that Sylvester existed and threatened Roberts) the effect of the threat on Roberts, i.e., to cause him not to report the grow operation to the police. *See* ER 801(c); Karl B. Tegland, 5B *Washington Practice* § 336, at 34-35 (1994); *cf. State v. Jessup*, 31 Wn. App. 304, 314-15, 641 P.2d 1185 (1982) (in prosecution

---

[7]Although the State argued that the real reason that the operation began later was that Roberts lost his job, this explanation does not make Roberts's evidence irrelevant.

for promotion of prostitution by use of force and threats, witness, a prostitute, properly allowed to testify that a third person told her defendant had threatened another prostitute, and to testify that defendant had glared at witness to induce her to perform acts of prostitution; witness's state of mind at time of prostitution relevant to ultimate issue at trial, and admissible under ER 803(a)(3)).[8]

## B. Dominion and Control

The trial court dismissed the case against Dougherty because Dougherty had no authority to evict Sylvester from the basement. Implicit in this holding is the trial court's opinion that because he had authority to evict Sylvester, Roberts had dominion and control over the basement, allowing the State to hold him criminally liable for the grow operation, even if the operation belonged solely to Sylvester.

■ To convict Roberts of possession, the State must demonstrate that Roberts either actually or constructively possessed the marijuana. *See, e.g., State v. Staley*, 123 Wn.2d 794, 798, 872 P.2d 502 (1994).[9] Constructive possession means that the person charged with possession exercised dominion and control over the contraband. *Staley*, 123 Wn.2d at 798. Dominion and control over the premises in which the police discover drugs is but one factor in determining whether the defendant had dominion and control, i.e., constructive possession, of the drugs themselves. *State v. Callahan*, 77 Wn.2d 27, 30, 459 P.2d 400 (1969) (citing *State v. Chakos*, 74 Wn.2d 154, 443 P.2d 815 (1968), *cert. denied sub nom. Christofferson v. Washington*, 393 U.S. 1090 (1969)). Whether Roberts possessed the

---

[8]We reject the State's contention that this evidentiary ruling was not preserved for appeal by Roberts's explanation to the trial court that the testimony was presented to show state of mind. This clearly was sufficient to bring to the trial court's attention that Roberts's state of mind (not Sylvester's) was at issue.

[9]The State presented no evidence of actual possession, relying entirely on a constructive possession case.

marijuana is a question of fact for the jury. *Staley*, 123 Wn.2d at 802.

By establishing a defendant's dominion and control over the premises in which contraband is found, the State makes out a prima facie case sufficient to raise a *rebuttable* presumption of constructive possession of the contraband. *State v. Perry*, 10 Wn. App. 159, 162, 516 P.2d 1104 (1973), *review denied*, 83 Wn.2d 1011 (1974). To the extent that the jury believed that Sylvester existed, subleased the basement, and exclusively occupied the recreation room where the grow operation was located, e.g., by putting locks on the doors, Roberts presented a viable defense to dominion and control of that recreation room, notwithstanding his ability as a landlord to evict Sylvester for maintaining the grow operation in the subleased premises. *See* RCW 59.18.150 (severely restricting a landlord's right of entry into "dwelling unit"); RCW 59.18.030(1) (defining dwelling unit to include part of a structure used as a sleeping place by one person); RCW 59.18.030(2) (defining landlord to include sublessor); RCW 59.18.290 (prohibiting landlord from removing or excluding tenant from premises except by court order).

■ Applying this law to the instant case, the trial court erred in assuming that Roberts's ability to evict Sylvester amounted to dominion and control over the premises sufficient to support an inference of constructive possession of the contraband.

Wood's testimony was material because it potentially confirmed that Sylvester was Roberts's tenant, in that Roberts allegedly informed Woods not to enter the basement during Thanksgiving week of 1992, because the basement was rented to someone else. This was potentially corroborated by testimony from Long and Mahoney that the grow operation did not exist before Sylvester moved into the basement. Finally, Sylvester's threats, about which Roberts unsuccessfully tried to testify, could potentially establish that although Roberts knew of the operation in the basement, he attempted to get Sylvester

to leave, and at no time exercised any dominion and control over the plants themselves.[10]

We conclude that the trial court's erroneous evidentiary rulings prevented Roberts from presenting his defense. We reverse and remand for a new trial.

## II
### ACCOMPLICE LIABILITY

Roberts argues on appeal that the prosecutor engaged in misconduct by misleading the jury about the law of accomplice liability. The prosecutor argued that the jury could find Roberts guilty as an accomplice on the facts as presented because Roberts accepted rent from Sylvester, paid two-thirds of the utilities, did not call his landlord or the police, and did not destroy the marijuana plants. Thus, according to the prosecutor, Roberts "gave . . . shelter" to the operation and had "dominion and control over the plants." Report of Proceedings at 351. We address this issue because the prosecutor's argument exhibits a misunderstanding of accomplice liability in the landlord-tenant context.[11]

To establish accomplice liability the State must demonstrate more than Roberts's physical presence at the scene and assent to the crime committed. *State v. Amezola*, 49 Wn. App. 78, 89, 741 P.2d 1024 (1987) (citing *In re Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979)). "One does not aid and abet unless, in some way, he associates himself with the undertaking, participates in it as in something he desires to bring about, and seeks by his ac-

---

[10]*Contrast Chakos*, 74 Wn.2d at 157-58 (where tenants sublet some rooms but police found drugs in every room of the house, evidence was sufficient to support finding of constructive possession). Here, the police found marijuana upstairs which Roberts admitted to possessing, but the small amount was insufficient to establish intent to manufacture or deliver.

[11]We treat the prosecutor's argument as a misunderstanding of applicable law, rather than as misconduct. Our remand for retrial will require the trial court and the parties to revisit the accomplice liability issue. The remainder of our opinion should serve as guidance to the trial court and parties on remand.

tion to make it succeed." *Amezola,* 49 Wn. App. at 89 (quoting *State v. J-R Distribs., Inc.,* 82 Wn.2d 584, 593, 512 P.2d 1049 (1973), *cert. denied,* 418 U.S. 949 (1974)). Thus, the defendant must be ready to assist in the crime. *State v. Luna,* 71 Wn. App. 755, 759, 862 P.2d 620 (1993).

In the instant case, assuming there was a Sylvester, Roberts was Sylvester's landlord. *See* RCW 59.18.030 ("'Landlord' means the owner, lessor, or sublessor of the dwelling unit or the property . . . .").[12] As such, Sylvester's rights and Roberts's remedies were limited to those provided by the Residential Landlord-Tenant Act. Sylvester could not utilize the premises for "drug-related activity." *See* RCW 59.18.130(6). Upon learning of Sylvester's violation, Roberts could not cause the termination of Sylvester's utilities. RCW 59.18.300. Roberts could not enter upon Sylvester's leasehold and destroy the plants himself. *See* RCW 59.18.150 (requiring tenant's consent to entry by landlord, except in case of emergency or abandonment).[13]

■■ Thus, Roberts could not be found guilty as an accomplice by accepting rent, paying utilities, and not utilizing self-help to terminate Sylvester's grow operation. His failure to contact his landlord or the police amounts only to presence and assent to criminal activity, which as a matter of law cannot support a finding of accomplice liability. *See Amezola,* 49 Wn. App. at 89. Neither could the jury convict Roberts as an accomplice for failing to initiate an unlawful detainer proceeding, as this, too, amounts only to presence and assent to the criminal activity.[14]

Reversed and remanded for new trial.

---

[12]Nothing in RCW 59.18.040 exempts Roberts's purported arrangement with Sylvester from the coverage of the Residential Landlord-Tenant Act.

[13]Given the prevalence of violence related to "drug related activity" we explicitly decline to adopt a position encouraging landlords to utilize self-help to end such activity by their tenants.

[14]Roberts was not charged with violating either of Washington's "crack house" statutes, RCW 69.50.402(6) or RCW 69.53.010(1), which make criminal the knowing maintenance of any "place" for delivery, manufacture, sale, transfer, use, or storage of any controlled substance. A landlord violates RCW

BAKER, C.J., and Cox, J., concur.

69.53.010(1) by knowingly acquiescing in such activity by a tenant or subtenant. *See State v. Sigman*, 118 Wn.2d 442, 447-48, 826 P.2d 144, 24 A.L.R.5th 856 (1992). The landlord can defend a charge of violating RCW 69.53.010(1) by proving that he or she made a good faith effort to contact the police, or has initiated an unlawful detainer action. *See* RCW 69.53.010(2).