IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35208-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| AMIE N. MELAND | ) | |
| also known as AMIE N. BRAUNSTEIN, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, A.C.J. — Amie Meland appeals her conviction for manufacturing marijuana. We affirm.

## FACTS

Ms. Meland shared a home with her boyfriend, his brother and her children. The home was owned by Ms. Meland's stepmother, who did not live on the premises. No formal lease agreement governed Ms. Meland's tenancy.

In September 2015, police executed a search warrant at Ms. Meland's residence based on a marijuana grow located in the backyard. During the search, officers seized 27 marijuana plants from the yard; marijuana and scissors bearing apparent marijuana residue from the kitchen; and glass pipes and drying marijuana from the basement.

Ms. Meland was charged with manufacturing marijuana. She took her case to trial and testified in her defense. According to Ms. Meland, she participated in smoking store-bought marijuana at her residence, but did not help with the marijuana grow. Ms. Meland explained the marijuana operation was her boyfriend's. She said she asked him to stop for the sake of her kids, but he did not. Ms. Meland recognized she could have asked her boyfriend to move out, but she declined to do so because she loved him. Ms. Meland admitted that it had been her "choice" to let her boyfriend remain at her residence, even though it meant continuation of the marijuana operation. 1 Report of Proceedings (RP) (Mar. 7, 2017) at 187.

The final jury charge included an instruction based on WPIC 50.12[1], defining the meaning of manufacture. The instruction stated, "[m]anufacture means the direct or indirect production, preparation, propagation or processing of any controlled substance." Clerk's Papers (CP) at 78. Ms. Meland's attorney objected to this instruction, arguing the words "'direct and indirect'" were vague and misleading. 1 RP (Mar. 7, 2017) at 131. Counsel for the State justified the instruction by arguing Ms. Meland's role as the home's de facto landlady meant she was responsible for providing a location for the marijuana

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 50.12, at 1140 (4th ed. 2016) (WPIC).

2

grow. According to the State, this conduct qualified as indirect production of marijuana.

Although the court's instructions included both the direct and indirect language, the court denied the State's request for an accomplice liability instruction. The court explained it did so because the charging information did not allege accomplice liability and because the State could argue the same theory given the direct or indirect portion of WPIC 50.12. 1 RP (Mar. 7, 2017) at 138.

In closing argument, the State emphasized Ms. Meland had direct or indirect involvement in manufacturing marijuana because she had dominion and control of the house. The prosecutor stated:

> Now, this is very important. Manufacture means the direct or indirect production, preparation, propagation or processing of any controlled substance. This is important because of the defendant's status in that house. That was her house. People who were in that house were there with her consent and by permitting the activity in the house, she directly or indirectly produced the marijuana. And remember, she said—I asked her if after she said she didn't like it, she wanted her boyfriend to stop it, and I said, [c]ouldn't you have asked him to leave? And she said yes. And I said, [d]id you ask him to leave? No, because I was in love with him. And she got sort of emotional, and that's tough.
> . . . .
> Again, her house, and she was the only person who had permission from the owner of the house to be there. Everyone else was there at her consent, by her leave. She had the control.
> We heard the terms "dominion and control." She was the one with dominion and control. That was for all intents and purposes her house.

3

2 RP (Mar. 7, 2017) at 211-12. During deliberations, the jury submitted two questions

asking the court to define "indirect." CP at 84-85. Each time, the trial court responded,

"[p]lease review the Jury Instructions previously provided." *Id.* The jury convicted Ms.

Meland as charged.

## ANALYSIS

Ms. Meland was convicted of manufacturing a controlled substance in violation of

RCW 69.50.401. Manufacture is defined as:

> the production, preparation, propagation, compounding, conversion, or
> processing of a controlled substance, either *directly or indirectly*.

Former RCW 69.50.101(s) (2015) (emphasis added).

As noted above, the trial court's instruction defining manufacture was consistent

with this statutory language. Ms. Meland challenges the appropriateness of this

instruction.

We review the adequacy of the court's jury instruction de novo. *State v. Levy*,

156 Wn.2d 709, 721, 132 P.3d 1076 (2006). The law requires a "manifestly clear

instruction." *State v. LeFaber*, 128 Wn.2d 896, 902, 913 P.2d 369 (1996), *abrogated on

other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009). The jury

instructions read as a whole must clearly announce to an average person the legal

standard the jury must apply. *LeFaber*, 128 Wn.2d at 900. If the jury instructions allow

4

jurors to arrive at an erroneous verdict or a conclusion contrary to law, the instructions lack sufficient clarity. *Id.* at 902-03.

Ms. Meland claims the court's instructions were insufficiently clear because they permitted her to be convicted on an erroneous legal theory. Specifically, the instructions allowed the jury to convict Ms. Meland based on her status as the de facto landlady of the residence, as argued by the State. Ms. Meland points to *State v. Roberts*, 80 Wn. App. 342, 345, 908 P.2d 892 (1996), which held that a landlord cannot be held responsible for a tenant's criminal activities based merely on the landlord's failure to exercise eviction powers.

We find *Roberts* inapplicable. Mr. Roberts was charged with possession of marijuana with intent to deliver or manufacture based on a marijuana grow operation that had been discovered in his basement. At trial, Mr. Roberts sought to present evidence that he had sublet his basement to a tenant and that he had no control over the tenant's activities. The trial court excluded this evidence as irrelevant, but Division One of our court reversed. The *Roberts* court explained that "[a] landlord, knowing that a tenant possesses contraband but failing to evict the tenant, does not, by that failure, exercise dominion and control over the contraband." 80 Wn. App. at 345. In addition, the court held that Mr. Roberts could not be convicted as an accomplice based on his failure to

5

evict his tenant or intervene in the tenant's marijuana operation. *Id.* at 356. In support of this holding, the court looked to Washington's Residential Landlord-Tenant Act of 1973, chapter 59.18 RCW, which restricts a landlord's ability to access a tenant's leasehold or property and requires legal process prior to eviction. *Id.* at 354, 356.

Ms. Meland's circumstances were materially different from those in *Roberts*. Unlike what was proffered in *Roberts*, Ms. Meland and her boyfriend did not have a traditional landlord-tenant relationship. Instead, they shared a common household. Although Ms. Meland's interests in the property were superior to those of her boyfriend, the Residential Landlord-Tenant Act did not restrict Ms. Meland's right to unfettered access and control over all areas of the home. Because she shared full access to the premises, Ms. Meland could properly be found in constructive possession of the marijuana on the property. *State v. Chakos*, 74 Wn.2d 154, 157-58, 443 P.2d 815 (1968). *Roberts* specifically excluded shared households from the reach of its decision. 80 Wn. App. at 355 n.10.

Because this case involved a shared residence, not an arms-length landlord and tenant relationship, Ms. Meland's challenge to the court's jury instructions is inapposite. The trial court's instruction here defining manufacture was an accurate statement of law and allowed the State to argue Ms. Meland indirectly participated in manufacturing

6

marijuana by choosing to provide her boyfriend a grow site. This was a viable theory of liability. *See State v. Gallagher*, 112 Wn. App. 601, 613-14, 51 P.3d 100 (2002) (sufficient evidence of accomplice liability based on obvious manufacturing activities of co-tenant when defendant allowed co-tenant to live at his residence rent free). No further review is therefore warranted.[2]

## CONCLUSION

The judgment of conviction is affirmed. Ms. Meland's request to deny appellate costs is granted based on the State's apparent lack of objection.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, A.C.J.

I CONCUR:

_____
Siddoway, J.

---

[2] Because we have affirmed Ms. Meland's conviction, we need not address the State's cross appeal regarding the refusal to provide an accomplice liability instruction.

No. 35208-1-III

FEARING, J. (dissent) — The majority creates a new theory of criminal liability, the shared premises theory, a theory never argued by the State or supported by precedent. In so ruling, the majority also engages in fact finding by ruling that Amie Meland chose to provide her boyfriend a grow site, when the undisputed evidence establishes that Meland objected to her boyfriend's growing of marijuana and took no steps to further the operation. Finally, the majority relies on precedent imposing accomplice liability when Meland's trial court refused to render an accomplice liability jury instruction.

This appeal asks us to measure the ambiguity or clarity of the phrase "direct or indirect" in the context of manufacturing a controlled substance. The jury convicted Amie Meland of manufacturing marijuana, and she challenges a jury instruction that allowed her conviction based on the "direct or indirect" production of the green flower. Because the State, contrary to precedent, contended that Meland engaged in the "indirect" production of marijuana by being the practicing landlady of premises, on which others grew marijuana, I would accept the challenge and reverse Meland's conviction.

FACTS

This prosecution arises from marijuana cultivation at an East Carlisle Street residence in Spokane. Christina Rosman, defendant Amie Meland's former mother-in-

law, owned the residence and allowed Meland and her two children to live in the home. Meland and Rosman maintained no written lease. Beginning in January 2013, Meland's boyfriend Devon Porter, and Devon's brother, Darrell Porter, also resided in the residence. Owner Rosman met Devon and Darrell Porter and spoke with them on occasion. Meland needed no consent from Rosman for others to reside in the house.

On September 21, 2015, the Spokane Police Department received a complaint of an assault at the East Carlisle residence and of marijuana growing in the backyard of the abode. We do not know what, if any relationship, the assault had to the marijuana growth. Law enforcement researched and discovered that Amie Meland lived at the address and Meland was the subject of a pending arrest warrant for driving with a suspended license.

Amie Meland had no criminal history other than driving without a valid license. She testified at trial that adults smoked marijuana only in downstairs bedrooms where her children were not allowed to enter. Meland knew her boyfriend, Devon Porter, grew marijuana in the backyard, but she did not help with the cultivation and told him to cease growing plants. Porter refused. Meland did not tell him to move because she loved him.

After receiving the tip, law enforcement officers went to the residence to investigate the allegations of assault and the marijuana operation and to execute the arrest warrant. When the officers knocked on the front door, no one answered. As an officer

walked along a driveway to a door on the side of the house, he saw marijuana in the back yard.

Amie Meland answered a knock at the side door. The rapping officer asked her about an altercation earlier that day, and Meland responded. The officer concluded that he lacked probable cause to arrest for an assault, but he arrested Meland for the outstanding warrant and transported her to jail. After obtaining a search warrant, officers returned to the residence's backyard, cut the marijuana plants, and confiscated the plants. Officers collected twenty-seven marijuana plants from the yard.

Officers also entered the East Carlisle dwelling and seized documents that confirmed Devon Porter, along with Amie Meland, was a "primary resident" of the abode. Officers found, in the kitchen, marijuana and scissors with green smudging or residue on the blades. In the basement bedroom quarters, officers found glass pipes and drying marijuana. Detective John Willard reviewed electric company records, which named Meland as the subscriber, but did not reflect power usage consistent with marijuana growing inside the home.

At trial, Detective John Willard conceded that no evidence linked Amie Meland to growing marijuana other than her living at the East Carlisle house. Meland admitted in her testimony to smoking marijuana the day before officers searched her home while hosting a football party, but she did not smoke marijuana produced in the backyard. She legally purchased the marijuana at a store. Meland also identified smoking paraphernalia

3

found in her bedroom. She neither bought nor used the scissors found in the kitchen and did not know whether Devon or Darrell Porter brought them into the kitchen.

PROCEDURE

The State of Washington charged Amie Meland with manufacture of a controlled substance—marijuana. The State did not prosecute Devon or Darrell Porter with the offense.

During the jury instruction conference, the State requested an instruction based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 50.12, at 1140 (4th ed. 2016) (WPIC), which defines the word manufacture for purposes of manufacturing a controlled substance. Defense counsel objected to including "direct or indirect" in the definition. Report of Proceedings (RP) at 131. Counsel noted that WPIC 50.12 places brackets around the phrase "direct or indirect" and therefore the phrase was optional. RP at 131. Defense counsel characterized the words "direct or indirect" as vague and misleading and as bearing the potential for a conviction based solely on knowledge of or presence near the marijuana plants. The State argued that Amie Meland functioned as the "landlady" in charge of the house and her role supported use of the word "indirect" because she provided a location to grow marijuana and allowed marijuana activity to occur inside the house.

The trial court included the bracketed words "direct or indirect" in the jury instruction because Meland lived in and controlled the house. In instruction 7, the trial

4

court wrote that "[m]anufacture means the direct or indirect production, preparation, propagation or processing of any controlled substance." Clerk's Papers (CP) at 78.

The State requested an accomplice liability instruction. It argued Meland provided aid to the Porter brothers by affording a locus for growing the marijuana and a house in which to process the plants. The court denied the State's request because the charging information did not allege accomplice liability and because the State could argue the same theory given the "direct or indirect" portion of WPIC 50.12.

In closing argument, the State emphasized that Amie Meland had "direct or indirect" involvement in the manufacture of the marijuana grow because she had dominion and control of the house. The prosecution commented:

> Now, this is very important. Manufacture means the direct or indirect production, preparation, propagation or processing of any controlled substance. This is important because of the defendant's status in that house. That was her house. People who were in that house were there with her consent and by permitting the activity in the house, she directly or indirectly produced the marijuana. And remember, she said—I asked her if after she said she didn't like it, she wanted her boyfriend to stop it, and I said, [c]ouldn't you have asked him to leave? And she said yes. And I said, [d]id you ask him to leave? No, because I was in love with him. And she got sort of emotional, and that's tough.
>
> . . . .
> . . . Again, her house, and she was the only person who had permission from the owner of the house to be there. Everyone else was there at her consent, by her leave. She had the control.
> We heard the terms "dominion and control." She was the one with dominion and control. That was for all intents and purposes her house.

5

RP at 211-12. During deliberations, the jury submitted two questions asking the court to define "indirect." Each time, the trial court responded, "[p]lease review the jury instruction previously provided." CP at 84-85. The jury convicted Meland as charged.

LAW AND ANALYSIS

On appeal, Amie Meland assigns error to the delivery of jury instruction 7 that defines "manufacture" as "the direct or *indirect* production, preparation, propagation or processing of any controlled substance." CP at 78 (emphasis added). The State cross-appeals and assigns error to the trial court's refusal to give an accomplice liability instruction. Because the majority affirms the conviction on the basis that the jury instruction created no error, the majority does not address the State's cross-appeal.

The State convicted Amie Meland with manufacturing a controlled substance in violation of RCW 69.50.401. In turn, former RCW 69.50.101(s) (2015) defines "manufacture" as:

> 'Manufacture' means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either *directly or indirectly* or by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container. The term does not include the preparation, compounding, packaging, repackaging, labeling, or relabeling of a controlled substance.

(Emphasis added.)

6

On appeal, Amie Meland complains of ambiguity in the words "direct or indirect" found in jury instruction 7. The State urged the trial court to include the phrase because Meland as the functioning "landlady" controlled use of the residence. The State argued the propriety of the word "indirect" because Meland held dominion and control over the house, provided a location to grow the marijuana, and could have evicted her boyfriend.

I recognize that RCW 69.50.101(s) includes the words "directly or indirectly." Nevertheless, I agree with Amie Meland. Because of the evidence in this case and the argument of liability presented by the State to the jury, jury instruction 7 was misleading. In other contexts, instruction 7 may be proper.

This court reviews challenges to jury instructions de novo within the context of the jury instructions as a whole. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006); *State v. Sublett*, 156 Wn. App. 160, 183, 231 P.3d 231 (2010), *aff'd on other grounds*, 176 Wn.2d 58, 292 P.3d 715 (2012); *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). The law requires a "manifestly clear instruction." *State v. LeFaber*, 128 Wn.2d 896, 902, 913 P.2d 369 (1996), *abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009). The jury instructions read as a whole must clearly announce to an average person the legal standard the jury must apply. *State v. LeFaber*, 128 Wn.2d at 900. If the jury instructions allow jurors to arrive at an erroneous verdict or a conclusion contrary to law, the instructions lack sufficient clarity. *State v. LeFaber*, 128 Wn.2d at 902-03.

7

Jury instructions suffice when they allow the parties to argue their theory of the case, do not mislead the jury, and accurately state the law. *State v. Tili*, 139 Wn.2d 107, 126, 985 P.2d 365 (1999). The reviewing court cannot assume that a jury given ambiguous instructions followed the law. *State v. McLoyd*, 87 Wn. App. 66, 71, 939 P.2d 1255 (1997), *aff'd sub nom. State v. Studd*, 137 Wn.2d 533, 973 P.2d 1049 (1999).

I side with Amie Meland primarily because the State's theory of imposing criminal liability on Meland for her role as landlady clashes with principles of law. A landlord's ability to evict a tenant does not automatically hold the landlord criminally liable for a marijuana growing operation if the grow belongs solely to the tenant. *State v. Roberts*, 80 Wn. App. 342, 353-54, 908 P.2d 892 (1996). A landlord, knowing that a tenant possesses control over the contraband but failing to evict the tenant, does not, by that failure, exercise dominion and control over the contraband. *State v. Roberts*, 80 Wn. App. at 345.

The State distinguishes *State v. Roberts* because the reversal in *Roberts* resulted from the denial of the defendant's right to argue that the marijuana cultivation belonged to a subtenant. The State emphasizes that challenged jury instruction 7 still permitted Amie Meland to argue her theory that Devon and Darrel Porter exclusively manufactured the marijuana.

I reject the State's position because the challenged jury instruction permitted and resulted in the State arguing to the jury that Amie Meland, by virtue of being the landlady

8

and without any other connection to the marijuana, indirectly engaged in manufacturing. The *Roberts* court deemed such an argument erroneous. Meland's freedom to argue her theory of the case did not prevent the jury from rejecting her theory and convicting her of manufacturing contrary to the law. The jury could convict her despite Detective John Willard's testimony that no evidence connected Meland to the growing management other than her tenancy in the home. The jury's two questions to the court confirm the ambiguous nature of the jury instruction that could lead to a false conviction.

The State of Washington highlights that this court approved the contested jury instruction in *State v. Stearns*, 59 Wn. App. 445, 799 P.2d 270 (1990), *aff'd*, 119 Wn.2d 247, 830 P.2d 355 (1992). Nevertheless, the *Stearns* court faced a distinct issue. The jury instruction upheld in *Stearns* declared: "[m]anufacture means the production, preparation, compounding, processing, directly or indirectly, as well as the packaging or repackaging of any controlled substances." *State v. Stearns*, 59 Wn. App. at 446 (internal quotation marks omitted). The defendant challenged the "packaging or repackaging" language of the instruction. The two-page opinion did not address the "direct or indirect" language used in this appeal.

The State also emphasizes *State v. Ng*, 110 Wn.2d 32, 750 P.2d 632 (1988), wherein the jury also asked a question about whether the defense of duress applied to the lesser included charges. The court responded by referring the jury to the instructions. The State cites the *Ng* decision for the proposition that a jury's question inheres in the

9

verdict such that Amie Meland cannot demonstrate any abuse of discretion in the trial court's decision to refer the jurors to the instructions as given. The State's argument misses the point. Meland does not challenge the trial court's decision to refer the jury to the instructions following their questions.

Finally, the State contends that any error in the jury instructions was harmless. If a record supports a finding that the jury verdict would be the same absent the error, harmless error may be found. *State v. Berube*, 150 Wn.2d 498, 506, 79 P.3d 1144 (2003). An omission or misstatement in a jury instruction is subject to harmless error analysis if it does not relieve the State of its burden of proving every essential element of the crime charged. *State v. Brown*, 147 Wn.2d 330, 339, 58 P.3d 889 (2002). The State maintains that the offending jury instruction did not relieve it of its burden of proving every essential element of the crime charged. Nevertheless, the ambiguity in the instruction, when juxtaposed with the State's argument to the jurors, lessened the burden of proving manufacturing, the first element contained in the to-convict instruction.

The State alternatively posits that untainted evidence led to a finding of guilt. Specifically, the State points to Amie Meland's admission of using marijuana and buying drug paraphernalia found in her bedroom. This contention also misses the mark. Meland only smoked marijuana lawfully purchased from a store. Meland's consumption of a legal product bears no relevance to whether Meland criminally manufactured a controlled substance.

10

The State forwards Amie Meland's dominion and control over the premises and her allowance of her boyfriend to use the backyard to grow the marijuana as further untainted evidence that supports the jury verdict. The State further contends that manufacturing occurred inside the home as evidenced by the drying marijuana found in the kitchen along with the residue ridden scissors. Nevertheless, as declared by Detective John Willard, no evidence connected Meland to the growing or manufacturing process regardless of whether one considers evidence inside or outside the home.

Use of the phrase "direct or indirect," within the context of the circumstances of this prosecution created an ambiguity that misled the jury as to the legal standard of criminal liability. Since the ambiguity related to an important element of the crime, the error was not harmless.

The majority relies on *State v. Gallagher*, 112 Wn. App. 601, 613, 51 P.3d 100 (2002). The majority writes that the decision stands for the proposition that sufficient evidence exists to convict one of accomplice liability of drug manufacturing based on the obvious manufacturing activities of a co-tenant when the accused allowed the co-tenant to live at his residence rent free. The majority implies that the only evidence of accomplice liability was the permission of allowing the manufacturer to live on the rented premises. Not so. Law enforcement found Dennis Gallagher's fingerprints on a can of denatured alcohol in his co-tenant's bedroom and located a hydrochloric acid gas generator in Gallagher's bathroom. Both items are critical to the manufacturing of

11

No. 35208-1-III
*State v. Meland aka Braunstein* (dissent)

methamphetamine. The court reasoned that all the evidence supported the jury's conclusion that Gallagher participated in the process of manufacturing methamphetamine, either personally or by knowingly giving aid or assistance to the co-tenant.

The State presented no evidence of Amie Meland's participation in or encouragement of her boyfriend's marijuana production. The State admitted that no evidence supported Meland's assistance in the manufacturing. To the contrary, Meland objected to the manufacturing. She took no steps to remove her boyfriend from the premises because she loved him. Love for the criminal actor is not a basis for accomplice liability.

More importantly, the majority fails to recognize that the State never pled accomplice liability and the trial court refused to deliver an accomplice liability instruction. Assuming the majority wishes to impose accomplice liability on Meland, the majority must first address the State's cross-appeal of the trial court's denial of an accomplice liability jury instruction and then remand for a new trial during which the trial court instructs on this theory of liability. Appellate courts do not affirm criminal convictions on theories never pled by the State and never submitted to the jury.

Fearing, J.

12